[No. C017728. Third Dist. Jan. 27, 1995.]

STATE COMPENSATION INSURANCE FUND, Plaintiff and Appellant,
v.
ROBERT A. BROWN et al., Defendants and Respondents.

## Counsel

Krimen & Bjornsen and Frank J. Abi-Nader for Plaintiff and Appellant.

Greg P. Stefflre for Defendants and Respondents.

## Opinion

**DAVIS, J.**—Plaintiff State Compensation Insurance Fund (SCIF) filed an action against its former insureds, Robert and Judy Brown, alleging its right to recover premiums due on the insurance contract.[1] The defendants, doing business as Mountain Valley Trucking (MVT), successfully moved for summary judgment on the ground they were not contractually obligated to pay the premiums because the workers on whom the premium claim was based were not employees eligible for workers' compensation benefits. SCIF's appeal challenges both the trial court's jurisdiction and its conclusion that the workers were independent contractors as a matter of law. We shall affirm.

---

[1]To be more accurate, SCIF's assignee filed the complaint and apparently reassigned the cause of action to SCIF after filing a notice of appeal from the judgment entered against it. For ease of reference, however, we shall refer only to SCIF as plaintiff.

## Scope of Review

"Since a summary judgment motion raises only questions of law regarding the construction and effect of the supporting and opposing papers, we independently review them on appeal, applying the same three-step analysis required of the trial court. . . . First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. [¶] [Second], we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in [the] movant's favor. . . . [¶] When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203], citations omitted.)

## The Pleadings

The pertinent portion of the complaint is brief. "[W]ithin four years last past [MVT] became indebted to . . . [SCIF] upon an open book account for insurance premiums for the period of 12/2/89 to 4/14/92 for Policy No. 1092503-89 in the amount of $192,069.65 principal, $19,506.00 interest from December 2, 1989 to December 1, 1992 which [MVT] promised and agreed to pay." SCIF further alleged, "[N]o part of said sum has been paid." The allegations appeared in causes of action for an account stated and for indebtedness on an open book account.

## The Defendants' Showing

Center stage in the defendants' motion papers is the insurance contract itself (which had not been appended to the complaint), as it defines their contractual duties. The contract begins by reciting the agreement is "[i]n return for the payment of the premium . . . ." Under the "General Section," the following pertinent provisions appear:

"B. Who Is Insured

"You are insured for your liability to your employees . . . , subject to the provisions of this policy.

" . . . . . . . . . . . . . . . . . . . . . . .

"E. Who Is Eligible for Benefits

"Your employees . . . are eligible for benefits under this policy, except that: . . . 2. Employees who are excluded under the workers' compensation law are not eligible for benefits under this policy, unless they have been included on the Declarations or by endorsement."

Under "PART ONE," the policy describes its workers' compensation coverage:

"B. WE WILL PAY

"We will pay promptly when due to those eligible under this policy the benefits required of you by the workers' compensation law."

Part One also notes that "Terms of this insurance that conflict with the workers' compensation insurance law are changed by this statement to conform to that law."

Finally, "PART FIVE" contains the following material provisions regarding premiums:

"A. MANUALS

"All premium[s] for this policy will be determined by the Workers' Compensation Insurance Rating Bureau's manuals of rules, rates, rating plans and classifications. . . .

". . . . . . . . . . . . . . . . . . . . . . . . .

"C. PREMIUM CALCULATION

"[The p]remium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period *for the services of*:

"1. *all your employees eligible for benefits under this policy . . .* ; and

"2. *all other persons engaged in work that could make us liable under Part One (Workers' Compensation Insurance) of this policy.* If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers' compensation obligations.

"D. PREMIUM PAYMENTS

"You will pay all premium[s] when due.

"E. FINAL PREMIUM

"The premium shown on the Declarations, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by

using the actual . . . premium basis and the proper classifications, rates and rating plans that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. . . .

"F. RECORDS

"You will keep records of information needed to compute premiums. You will provide us with copies of those records when we ask for them.

"G. AUDIT

"You will let us examine and audit all your records that relate to this policy. . . ." (Italics supplied.)

In addition to the contract, the defendants provided the declaration of Judy Brown (the chief operating officer and custodian of records for MVT).[2]

According to Mrs. Brown, she was responsible for obtaining the SCIF policy, which had been in effect from 1988 until its termination in May 1992. At no point did she agree to provide coverage for independent contractors working for them. Based on her discussions with SCIF staff, she believed the final premium due claimed by SCIF was based solely on payments to contract truck drivers who provided trucking services to MVT during the policy period. Each time SCIF billed MVT for these truckers, she had immediately objected. None of the truckers ever actually made a claim for workers' compensation benefits.

Although the exact nature of MVT's business is not spelled out in the declarations, it is described as a "broker" in "transporting intermodal freight," in which trucks are directed to customer pick-up and drop-off locations. Prior to 1988, MVT owned its own trucks and employed drivers. In 1988, however, MVT sold all its trucks and contracted thereafter for services from independent owner-operator truckers (for brevity of reference, "independents"). In only one instance did a former employee buy a truck from MVT (at full market price) and thereafter provide trucking services pursuant to contract. Contracting with independents is customary "in trucking" and is the arrangement used by all her competitors. The use of independents is not pretextual. Independents are an organized segment within the trucking industry, who have their own industry trade group. Independents prefer not to market their services directly to businesses but to work through brokers such as MVT. As for MVT, it wished to reduce its capital investment (and upkeep) in trucks and to have the ability to expand and contract its

---

[2]The trial court struck another declaration filed by the defendants as irrelevant.

fleet expeditiously in response to business volume, because the industry operates on narrow profit margins.

Mrs. Brown described the elements of the relationship between MVT and the independents. MVT paid the independents a flat sum per job upon presentation of bills of lading or other proofs of delivery. They were free to accept or reject any particular job. MVT did not expect them to work any minimum amount of jobs, and they could (and did) work for competing brokers. MVT did not prescribe any working conditions, including any set hours, and did not provide any directives on the manner in which the transportation services should be performed. The independents were in business for themselves, and assumed all the costs of their own operations, including fuel, maintenance, insurance, and payroll taxes. All the independents signed identical contracts with MVT reflecting the terms of this relationship, including an express acknowledgment of their independent contractor status. MVT did not pay the independents any benefits, withhold any payroll taxes or make employer contributions, and reported the compensation to tax authorities as payments to independent contractors.

## THE PLAINTIFF'S SHOWING

SCIF's initial opposition consisted only of the declaration of its attorney, which was not made on personal knowledge, contained hearsay, and admixed an extensive amount of legal argument into its scant factual averments. SCIF also failed to supply the prescribed responsive statement of disputed facts. (Code Civ. Proc., § 437c, subd. (b).) At the initial hearing on the motion for summary judgment, the trial court apparently granted MVT's motion to strike the affidavit and continued the matter to allow SCIF to present evidence in opposition.

Given this second chance, SCIF produced another declaration from its attorney and three declarations from its auditors who had been involved with the MVT account. Among the supporting documents was the Workers' Compensation Insurance Rating Bureau's manual of rules governing the underwriting of workers' compensation insurance. Nonetheless, none of these materials controverted the material facts described above, SCIF instead making inappropriate arguments relating to the weight to be accorded the evidence in support of the motion (e.g., that Mrs. Brown's declaration was self-interested and did not include documents in support of her averments). The true gist of the opposition was the assertion there were additional disputed facts regarding the status of the independents that precluded summary judgment. We accordingly restrict our recount of the opposition evidentiary materials to this subject.

Some additional historical facts appear in the declaration of SCIF's district underwriter. Because there had been an unusually high number of claims in 1988 on the defendants' policy (which covered the defendants' operation of both MVT and an unrelated rest home), SCIF notified the defendants it would be imposing a 300 percent surcharge on the policy for the 1989-1990 renewal. Mrs. Brown in reply stated, "We have made a major change in our operation since we have taken out this policy. . . . We also have sold all of our trucks and do not employ truck drivers any longer. We are only brokering loads and as you will see by our latest payroll report we will not be reporting in the truckmen category. [¶] Since all of our claims are tied to that category . . . , and with the change in our operation and our perfect safety record at the rest home and the office, I am requesting that the modification to our policy be limited to the truckmen category." The defendants included a copy of the contract MVT gave to the independents to sign which reflected the terms of MVT's relationship with them.

SCIF agreed to segregate the surcharge, applying it only to the truckmen category. However, based on its interpretation of case law and the ratings manual, SCIF had a practice of requiring its insureds to provide "either certificates of [workers' compensation] insurance or valid PUC/Cal-Trans permits . . . in order to demonstrate that a member of the truckmen classification . . . is an independent contractor and therefore no remuneration paid to [a truckman] should be included in a premium audit." Otherwise, it would collect a premium for the independents because it might have an exposure risk if the independents were found to be employees. The defendants returned the requested acknowledgment of this statement of SCIF practice with their request for renewal of the policy.

Despite repeated requests by SCIF for documentation, the defendants did not provide proof that the independents had either. The defendants informed the auditor that the independents were owner-operators, and engaged in interstate commerce so "the drivers by law cannot operate with a PUC or Cal-T [number]." Therefore, the defendants declined to provide any further information. Because the defendants became increasingly uncooperative with field audits by SCIF personnel, SCIF consequently canceled the policy in May 1992. SCIF calculated the final premium due based solely on 20 independents for whom MVT did not provide the requested documentation.

### DEFENDANTS' SUPPLEMENTARY SHOWING

In response to SCIF's initial inadequate opposition, the defendants produced the supplementary declaration of Mrs. Brown and their attorney. Mrs. Brown averred that MVT was subject to the jurisdiction of the Interstate

Commerce Commission (ICC) and it was her understanding from past practice that independents performing services for MVT required neither ICC nor state trucking permits. Defense counsel, in essence offering an expert opinion, attested to his 20 years of transportation law experience, described MVT as transporting shipments which had been or would be transported across state lines, and opined this subjected MVT's operations to the exclusive jurisdiction of the ICC which—by virtue of deregulation—did not require permits.

TRIAL COURT RULING

The court found the defendants' showing stood uncontroverted (except for the unpersuasive challenge to the competence of Mrs. Brown to attest to the matters in her declaration), and established the independents were not employees as a matter of law. As for SCIF's argument regarding the absence of documentation that the independents had workers' compensation insurance or trucking permits, "There is no evidence that the drivers had employees for whom they would need workers['] compensation insurance. There is no evidence or authority that P.U.C. permits were required, and no authority that lack of permits would be evidence the drivers were employees. Even if it were a factor to be considered, it could not, as a matter of law, outweigh the other factors, all of which point to a conclusion of independent contractor status."

DISCUSSION

I

*Trial Court Jurisdiction*

■ SCIF argues for the first time on appeal that the trial court lacked subject matter jurisdiction.[3] It relies solely on a decision rendered after judgment in this matter, *P. W. Stephens, Inc.* v. *State Compensation Ins. Fund* (1994) 21 Cal.App.4th 1833 [27 Cal.Rptr.2d 107] (*Stephens*). The decision is inapposite.

Although the *Stephens* court does not detail the employer's exact contention, apparently it had alleged that premium surcharges imposed by SCIF reflecting the employer's actual safety history (increasing the categorical premiums set for classes of employers and occupations) were "illegal, unreasonable and unfair." (21 Cal.App.4th at pp. 1835, 1839.) Because SCIF

---

[3]Lack of jurisdiction may be raised at any time. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 315, p. 326.)

is required to accept any insured (except those who present a risk beyond the capabilities of the insurance fund, or those who do not adhere to occupational safety laws), and could evade this responsibility by setting excessive surcharges, the court held the Insurance Commissioner was responsible for ensuring that SCIF's surcharges are fair and reasonable. (*Id.* at pp. 1839-1840.) Since the rating bureau which determined the categorical and individual surcharge rates specifically provided for entertaining the complaints of insureds about premium amounts, and also provided for an appeal to the Insurance Commissioner from any of its decisions, the court held there was an administrative remedy before an agency with greater expertise (on the subject matter of rates) which must be exhausted before resorting to judicial action. (*Id.* at pp. 1840-1842.)

The defendants' refusal in the present case to pay the final premium demanded by SCIF was not based on any challenge to the *rates* charged by SCIF either for the category of truckmen or for MVT's safety history. They challenged only the act of classifying the independents as employees rather than independent contractors. Thus, *Stephens* is factually inapposite.

We also conclude *Stephens* has no application by analogy. As determined in *Stephens*, the Legislature has vested the Insurance Commissioner and the state-created ratings agency with jurisdiction over rate-setting disputes; under such circumstances, administrative exhaustion is a jurisdictional prerequisite to resort to the courts (*Knickerbocker* v. *City of Stockton* (1988) 199 Cal.App.3d 235, 240 [244 Cal.Rptr. 764]). There is good reason for deferring to an initial agency determination: the propriety of premium rates and surcharges involve factors and methodology which require quasi-legislative action involving expertise in the subject matter, and courts have traditionally given deference to such agency determinations (*Henning* v. *Division of Occupational Saf. & Health* (1990) 219 Cal.App.3d 747, 758 [268 Cal.Rptr. 476]). Classifying a worker as employee or independent contractor, on the other hand, is a quintessentially adjudicatory function involving the interpretation of the statutes defining employees for the purposes of the Workers' Compensation Act. In such matters, our review of an agency interpretation of its controlling statutes is respectful but nondeferential. (*Henning, supra,* 219 Cal.App.3d at pp. 758-759; *Troy Gold Industries, Ltd.* v. *Occupational Safety & Health Appeals Bd.* (1986) 187 Cal.App.3d 379, 387, fn. 4 [231 Cal.Rptr. 861].) Thus, in the absence of a clear legislative mandate that the question of a worker's status for insurance premium purposes must be subjected initially to the administrative mechanisms for resolving insurance rate disputes, we find there is no jurisdictional obstacle to a trial court considering the dispute in the first instance.

## II

### *The Contractual Dispute*

Although the defendants have focused primarily on the status of the independents under the Workers' Compensation Act, that is only part of their burden in the summary judgment motion. They must also show the status of the independents absolves them of contractual liability for premiums. We address these questions in turn.

### A. *Status of independents*

1. Standards: Central to any analysis of employment status is the Supreme Court's decision in *S. G. Borello & Sons, Inc.* v. *Department of Industrial Relations* (1989) 48 Cal.3d 341 [256 Cal.Rptr. 543, 769 P.2d 399] (*Borello*). At issue was a stop order/penalty assessment issued by the Labor Commissioner for an employer's failure to obtain workers' compensation coverage for certain workers deemed employees. (*Id.* at p. 346.) Because *Borello* departed explicitly from the approach of prior decisions, we must recount it in some detail.

The court began by reiterating familiar principles. ■ Under the pertinent provisions of the Labor Code (to which subsequent undesignated section references will be), employers are liable for workers' compensation benefits only for employees injured in the course of employment. (48 Cal.3d at p. 349 [citing § 3600].) Employees are any workers under a contract of hire with the employer other than independent contractors. (*Ibid.* [citing §§ 3351, 3353].) The presumption is in favor of employee status, and the burden is on the party seeking to avoid liability to prove independent contractor status. (*Ibid.* [citing §§ 3357, 5705].) The Legislature has specifically mandated the statutes be liberally interpreted in favor of coverage for employees injured in the course of employment. (*Ibid.* [citing § 3202].)

The court then noted the concept of "independent contractor" arose at common law to *limit* an employer's vicarious liability for the misconduct of a worker; thus, the degree to which the employer had the right to control the worker's actions was directly pertinent to the employer's exposure to liability. (48 Cal.3d at p. 350.) This common law construct was incorporated as a limitation on coverage in much employment legislation. (*Ibid.*) Consequently, California courts focused on the right of the employer to control the manner and means of accomplishing the result for which the worker was hired. (*Ibid.*)

However, "[t]he common law and statutory purposes of the distinction between employees and independent contractors are substantially different.

While the common law tests were developed to define an employer's liability for injuries done *by* [the] employee, 'the basic inquiry in compensation law involves which injuries *to* the employee should be insured against by the employer.'" (48 Cal.3d at p. 352, original italics.) The statutory scheme transcends the limitations of the common law, so its definitions of the employment relationship must be construed with reference to its history and fundamental purposes. (*Id.* at p. 351.) ■ Thus, while the "right of control" criterion may be the most significant factor (*id.* at p. 350), it must be applied "with deference to the purposes of the protective legislation" (*id.* at p. 353).

■ The court identified four purposes of the workers' compensation system. First, there must be quick, limited compensation for injury. This is in exchange for the second purpose, the insulation of the employer from tort liability for the injuries. Third, the costs of industrial injuries are to be made part of the costs of the goods produced, rather than a burden on society. This leads to the fourth aim, spurring industrial safety. (48 Cal.3d at p. 354.) ■ Excluding workers from this system by categorizing them as independent contractors should occur only where the system's "goals are best served by imposing the risk of 'no-fault' work injuries directly on the provider, rather than the recipient, of a compensated service. This is obviously the case . . . when the [worker] has the primary power over work safety, is best situated to distribute the risk and cost of injury as [a business] expense of [an independent] business, and has independently chosen the burdens and benefits of self-employment." (*Ibid.*)

As a result, the court endorsed a multitude of factors to be considered in addition to the "right of control." (48 Cal.3d at p. 354.) These included the right to discharge at will without cause (*id.* at pp. 350-351), factors from the Restatement Second of Agency (*id.* at p. 351), standards from the specific context of construction contractors (*id.* at p. 351, fn. 5), and a six-factor test from federal labor jurisprudence which has "many points of individual similarity" with the other factors discussed in the opinion (*id.* at pp. 354-355).[4]

In the case before it, the *Borello* court concluded that unskilled agricultural harvesters controlling only the decisions of when to irrigate and harvest, the manner of training the cucumber vines, and weeding were not considered independent contractors. The work was an integral component of the grower's operations over which the grower otherwise exercised pervasive control, and the supposed "independence" of the harvesters from the

---

[4]It would serve little purpose in detailing this list of factors. It is sufficient for the purposes of this opinion to note that any factors we use in our analysis appear on these pages in *Borello*.

grower's supervision was not a result of superior skills but was a function of the unskilled nature of the labor, which required little supervision. Thus, for purposes of the right-of-control test, the grower retained all *necessary* control. (48 Cal.3d at pp. 356-357.) The other factors earlier identified by the court were also consistent with employee status. (*Id.* at pp. 357-359.) Among these were the extent to which the workers had substantial capital investment in addition to the services they offered, and whether the workers bore true entrepreneurial risk of profit or loss; the harvesters invested little other than labor and simple hand tools, and any "profit" or "loss" was no different than the "opportunity" the average pieceworker possessed. (*Id.* at pp. 357-358.)

As this extended exegesis upon *Borello* demonstrates, the process of distinguishing employees from independent contractors is fact specific and qualitative rather than quantitative. Right of control retains significance, but is no longer determinative. Thus, pre-*Borello* and common law authorities now have little if any value as workers' compensation precedent. (*Rinaldi* v. *Workers' Comp. Appeals Bd.* (1991) 227 Cal.App.3d 756, 762 [278 Cal.Rptr. 105].) This fact-specific nature of the inquiry also means post-*Borello* decisions presenting different facts have limited relevance for the present case, since they employ *Borello*'s criteria without any amplification.[5]

2. Analysis: ▆▆ Applying the pertinent *Borello* factors to the showing marshaled by the defendants in support of their motion for summary judgment, we conclude the independents are independent contractors as a matter of law. MVT does not possess the right of "necessary" control, and the factors otherwise do not weigh in favor of employee status.

Beginning with the issue of right of control, the contracts into which the independents voluntarily[6] entered when MVT restructured its operations gives them complete control over their working conditions and the manner in which a load is transported (including whether or not to hire assistants), and leaves them entirely free to accept or reject an assignment without reprisal. MVT's participation is limited to offering the assignments and paying compensation upon proof of delivery. The lack of supervision is not a function of the unskilled nature of the job (as in *Borello*) because truck driving—while perhaps not a skilled craft—requires abilities beyond those

---

[5]These decisions include *Torres* v. *Reardon* (1992) 3 Cal.App.4th 831 [5 Cal.Rptr.2d 52] [tree trimmer hired by homeowner an independent contractor]; *Rinaldi* v. *Worker's Comp Appeals Bd., supra,* 227 Cal.App.3d 756 [harvesting/pruning crew foreman an employee of almond rancher]; *Yellow Cab Cooperative, Inc.* v. *Workers' Comp. Appeals Bd.* (1991) 226 Cal.App.3d 1288 [277 Cal.Rptr. 434] [driver "leasing" cab from taxi company an employee]; *Johnson* v. *Berkofsky-Barret Productions, Inc.* (1989) 211 Cal.App.3d 1067 [260 Cal.Rptr. 67] [actor an employee of production company].

[6]There is no evidence in the record their consent to these contracts is vitiated by economic or other constraints.

possessed by a general laborer (or, indeed, possessors of ordinary driver's licenses), and the manner in which the services are provided require a greater exercise of the driver's discretion than the near-ministerial tasks of watering, weeding, and picking. Thus, MVT has shown (and SCIF has not controverted) its lack of any significant control over the independents' job performance.

Nor do the other pertinent factors from *Borello* shift the balance in favor of employee status. Although MVT (or the independents) can terminate the contracts at will with 14 days' notice, this is consistent either with an employment-at-will relationship or parties in a continuing contractual relationship. The independents are engaged in a distinct occupation, one with its own trade association. It is customary for brokers to hire independents rather than have driver employees. The independents work for brokers other than the defendants. The independents make the capital investment in their trucks, which is a substantial investment beyond the provision of their labor. The contracts are indefinite, which gives the relationship the permanence associated with employment. However, the work is performed and compensated on a job-by-job basis, with no obligation on the part of the independents to accept any assignment and no retribution by MVT for refusing assignments. Depending on how one defines MVT's "business," the work performed by the independents can either be considered an integral part of providing transportation services, or it could be considered a tangential aspect of the provision of brokering services; this is consequently not a strong factor either way. There is true entrepreneurial opportunity depending on how well the independents perform their transportation services; this is not mere "piece work." Finally, the parties expressly and voluntarily agreed to independent contractor status.

In the face of this overwhelming indication that the independents are not employees, SCIF clings to two factors as precluding independent contractor status. It argues the defendants failed to produce documentation that the independents have trucking permits from federal or state authorities, or their own workers' compensation insurance policies.

On the issue of trucking permits, we have noted in our recount of the materials adduced in the trial court that the defendants produced a declaration asserting Mrs. Brown's belief (and a declaration expressing her counsel's expert opinion) that the independents were not required to have trucking permits because state regulators have no jurisdiction and federal regulators do not require permits. In the procedural context of this case—a motion for summary judgment—it was SCIF's burden to produce evidence creating a triable issue with respect to this material fact. SCIF did not do so. It was also SCIF's burden as opponent (and now as appellant) to provide

authority for its argument that permits are required. SCIF has failed to do so, and it is not this court's function to explore the point on behalf of a party. Thus, without intimating any opinion on the accuracy of the defendants' position with respect to trucking permits, it stands unrefuted and consequently must be accepted for purposes of the summary judgment motion.

As for SCIF's reliance on the failure to show that the independents have workers' compensation insurance policies, there is no evidence that any of the independents had employees for whom they would be required to obtain insurance. As self-employed workers, they are not subject to the workers' compensation system unless they *opt* to obtain a policy from SCIF providing themselves with coverage. (1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation (2d ed. rev. 1994) § 3.144, p. 3-128; Ins. Code, § 11846; *Glass Containers, Inc.* v. *Ind. Acc. Com.* (1953) 121 Cal.App.2d 656 [264 P.2d 148].)

In any event, SCIF provides no authority that either type of documentation is the sine qua non of independent contractor status. Nowhere in *Borello* does the Supreme Court include the presence or absence of a workers' compensation insurance policy among the pertinent factors of analysis. As for licenses or permits, this surfaces only in the court's reference to the statutory factors used in the context of construction contractors. (48 Cal.3d at p. 351, fn. 5.) However, the need for a license for a construction contractor is peculiar to that context, because *by statute* the contractor cannot be deemed an independent contractor without proof of licensing. (*Ibid.*; *Neighbours* v. *Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 329-330 [265 Cal.Rptr. 788].) Thus, these two indicia identified by SCIF are simply potential evidence of the bona fide status of the independents' enterprises, but they are not determinative and are outweighed by the other factors discussed above.

 Concluding that the independents are not employees does not defeat the purposes of the workers' compensation system. The independents have far more control over their workplace safety than do the defendants, and they have the ability to spread the costs of insuring against work-related injuries through the fees charged for their services. Thus, the defendants have established under *Borello* that these workers are independent contractors.

B. *Interpretation of the policy*

 Determining the independent contractor status of the independents is not the end of our task. We must determine if MVT had a contractual obligation to pay premiums for such independent contractors.

Under the contractual provisions quoted previously (pt. Five, § C, *ante*), the defendants are obligated to pay a premium calculated as a function of the

premium basis. This premium basis consists of the payments made to employees eligible for workers' compensation benefits (*id.*, § C(1)), a category obviously not including the independents, and workers engaged in work that "could make [SCIF] liable" for workers' compensation benefits (*id.*, § C(2)). Since the drivers are independent contractors ineligible for workers' compensation benefits, SCIF could not be liable for benefits under the policy and payments to the independents cannot be included as part of the premium basis. Thus, the defendants are not liable for premiums calculated on the contractual payments made to the independents.

SCIF points to the contractual language (in pt. Five, § (C)(2), *ante*) obligating the defendants to provide proof that workers are insured by another employer in order to avoid application of the section. (Pt. Five, § F also requires the employer to provide copies of records necessary for the computation of premiums.) The proof requirement, however, does not alter the fact the defendants are contractually obligated to pay premiums only for those workers for whom SCIF could be liable for workers' compensation benefits. SCIF may prudently seek to charge premiums to cover workers whose independent contractor status is not shown to SCIF's satisfaction, and impose a contractual obligation on the employer to supply this proof. But SCIF's remedy for a breach of this obligation to supply the proof or pay the increased premium is cancellation of the contract (or, perhaps, a declaratory relief action). It cannot seek payment for workers who could not have subjected it to liability for benefits, because it did not define the premium obligation in the contract in this manner (in contrast, for example, with defining the premium obligation under section C(2) as "all other persons for whom you cannot supply affirmative proof of independent contractor status").

The defendants had no duty to pay premiums for workers who could not qualify for workers' compensation benefits under the policy, because SCIF cannot demand premiums based on these workers in addition to canceling the policy. The defendants were entitled to summary judgment in their behalf.

The judgment is affirmed.

Blease, Acting P. J., and Nicholson, J., concurred.