[No. B093722. Second Dist., Div. Two. June 28, 1996.]

JESUS EDUARDO GONZALEZ, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, INVESTORS
BUSINESS DAILY et al., Respondents.

COUNSEL

Gary Barnett for Petitioner.

Morrow, Scuria, Golenor, Salisbury & Czech and Reed M. Scuria for Respondents.

OPINION

**BOREN, P. J.—**

### INTRODUCTION

The Workers' Compensation Appeals Board (WCAB) rescinded the decision of a workers' compensation judge (WCJ). The WCJ had found petitioner was the employee of respondent Investors Business Daily (IBD), and thus covered by workers' compensation insurance, when petitioner was injured in a vehicle collision. After granting the petition for review, we reverse the decision of WCAB.

### PROCEDURAL BACKGROUND

In a traffic accident, petitioner sustained physical injuries to his back, pelvis, head, knee, and lower extremities. IBD denied petitioner's claim for

workers' compensation benefits on the ground that petitioner was not its employee. Petitioner then applied to WCAB for adjudication of his claim. IBD defended by alleging that petitioner had performed services for IBD as an independent contractor and not as an employee. After hearing evidence, the WCJ found that petitioner sustained his injuries in the course of petitioner's "employment" by IBD.

IBD petitioned for reconsideration. WCAB granted the motion, rescinded the WCJ's findings of fact, and ordered the matter returned to the WCJ for further proceedings with "a more exacting analysis of the facts." Upon reconsidering the matter, the WCJ again concluded the injuries arose out petitioner's "employment" by IBD.

IBD again petitioned for reconsideration. WCAB granted the motion once more and, after reconsideration, concluded that petitioner was an independent contractor and not an employee of IBD. WCAB then ordered that appellant was not entitled to workers' compensation benefits.

## STATEMENT OF FACTS

Petitioner was a newspaper route carrier from 1986 to 1993 for IBD. In May 1993, while delivering newspapers for IBD, petitioner was injured in a traffic accident in Mandeville Canyon.

Petitioner had signed on September 20, 1988, a contract entitled "Investor's Daily *Independent Carrier Agreement*."[1] It was a fill-in-the-blanks form contract written in English and drafted by IBD. The agreement provided: "It is the specific and express intention of the parties to establish by this agreement the relationship of independent contractor and contractee. The parties expressly disavow any intention to create or establish by this agreement the relationship of franchisor and franchisee or employer and employee. [¶] . . . [¶] The Carrier is free to deliver other publications, so long as such delivery does not interfere with the Carrier's ability to fulfill his/her commitments herein." The contract also obligated the carrier to bear all operating costs, including taxes, and to furnish his own supplies and vehicle, except that IBD was obligated to furnish rubber bands and plastic wrappers.

The contract further specified that either party may terminate the agreement at any time by giving two weeks' written notice. If the carrier failed to

---

[1]Petitioner also signed two additional contracts. One was a "lead carrier agreement" signed December 27, 1991. The other was a "transportation hauler agreement" signed October 19, 1992. The contracts specified duties other than mere delivery of the newspaper but incorporated basically the same independent contractor terms as the "carrier agreement." Because a finding that petitioner was an employee under the carrier agreement would implicate workers' compensation benefits, we need not examine the latter two contracts individually.

give such written notice, he was obligated to pay two weeks of carrier compensation. No indemnity provision or penalty was stated should IBD fail to give two weeks' notice. A witness for IBD testified that on occasion IBD would terminate a carrier "on the spot" for serious problems or multiple customer complaints.

Petitioner, subsequent to his initial engagement as a carrier for IBD, also undertook the responsibilities of both a lead carrier and transportation hauler.[2] As a lead carrier it was his responsibility to supervise routes other than his own and to assure that he or someone else covered them in the event a carrier was absent. As a hauler, petitioner was responsible for transporting newspapers from the plant to the drop site where the carriers picked up papers.

Petitioner was paid biweekly at a flat rate per each route delivered per day. (E.g., $31 per route per day paid every two weeks.) Compensation documents for the period from December 1992 through May 1993 showed biweekly compensation of between $462 and $680.

Petitioner testified at the hearing that he came to the United States in 1985 and began work for IBD sometime later. In the late afternoon he picked up papers for his and other carriers' routes at IBD's plant and transported them to a drop point. Then, following routes established by IBD, he delivered the papers to the customers by a time set by IBD. Originally, the papers were to be delivered before 6 a.m. Later, IBD changed the deadline to 12 midnight. The customers were in direct contact with IBD rather than petitioner, were solicited by IBD, and paid IBD by mail at billing rates determined by IBD. Petitioner was not charged for lost or undelivered papers. Petitioner not only drove his own route but oversaw other drivers and would fill in when a driver was not available to cover a particular route. Petitioner recruited drivers, while IBD supplied the routes. Petitioner did not pay the carriers he oversaw. IBD paid them directly.

Petitioner, who is fluent in Spanish, spoke and understood some English but could not read English. He did not understand the language in the carrier agreement. He knew he had to give two weeks' notice to quit. Petitioner acknowledged that he was paid a flat daily fee for his route and for being lead carrier and hauler. Petitioner had his own truck and was not reimbursed for gas, insurance, repairs, maintenance or registration fees. IBD did provide him with bags for the papers. Petitioner also delivered the *Daily News* and the *Los Angeles Times* on occasion.

---

[2]See footnote 1, *ante.*

Circulation manager Douglas Stone acknowledged that IBD permitted its delivery people to deliver other publications. Stone characterized petitioner as not a manager but rather a coordinator who was required to know how to read a map. According to Stone, there was no withholding taken from the checks issued to the carriers, and IBD could terminate someone immediately if warranted by the situation.

## DISCUSSION

■  "The Workers' Compensation Act (Act) extends only to injuries suffered by an 'employee,' which arise out of and in the course of his 'employment.' [Citations.] 'Employee[s]' include most persons 'in the service of an employer under any . . . contract of hire' [citation], but do not include independent contractors. The Act defines an independent contractor as 'any person who renders service for specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which said result is accomplished.' " (*S.G. Borello & Sons, Inc.* v. *Department of Industrial Relations* (1989) 48 Cal.3d 341, 349 [256 Cal.Rptr. 543, 769 P.2d 399], citing Labor Code §§ 3351, 3353, 3600, & 3700.) The Supreme Court held that "[t]he Act must be liberally construed to extend benefits to persons injured in their employment. ([Lab. Code] § 3202.) One seeking to avoid liability has the burden of proving that persons whose services he has retained are independent contractors rather than employees. ([Lab. Code] §§ 3357, 5705, subd. (a).)" (48 Cal.3d at p. 349.)

As explained by the California Supreme Court's landmark decision in *S.G. Borello & Sons, Inc.* v. *Department of Industrial Relations (Borello), supra,* 48 Cal.3d 341, 350-352, at common law the dispositive factor in determining whether an injured person was an employee was the amount of control exercised by the alleged employer over the person. In *Borello,* "sharefarmers" cultivated and harvested cucumbers pursuant to preprinted agreements. The agreements obligated the sharefarmers and their families to cultivate, fertilize, prepare, and harvest the growers' cucumber crop and left the method and manner of accomplishing these tasks to the sharefarmers. The sharefarmers were required to provide their own tools and transportation. The agreements also specified that the parties deemed themselves as principal and independent contractors rather than as employer and employees.

The Supreme Court ruled that the sharefarmers were employees entitled to the protection of the Workers' Compensation Act, rather than independent contractors. The court observed that the growers had " 'pervasive control' "

of their business and that the farmers were an " 'integral' " part of that business. (48 Cal.3d at pp. 356, 357.) *Borello* also emphasized both economic and societal concerns in furthering the protection of the workers' compensation law. (*Id.* at pp. 356-359.)

■ *Borello, supra,* 48 Cal.3d at pages 350-351, 353-355, held that the common law emphasis on control was no longer entirely dispositive and that there were many factors to consider. "These include (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or worker supplies instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Borello, supra,* 48 Cal.3d at p. 351.) The court also observed, " 'Generally, . . . the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' [Citation.]" (*Ibid.,* fn. omitted.)

Five related factors were also enumerated by the Supreme Court in *Borello*: "(1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business. . . ." (*Borello, supra,* 48 Cal.3d at p. 355, citation omitted.)

After *Borello*, the Court of Appeal applied its principles in *Yellow Cab Cooperative, Inc.* v. *Workers' Comp. Appeals Bd.* (1991) 226 Cal.App.3d 1288 [277 Cal.Rptr. 434], which held that cabdrivers were employees of Yellow Cab. The court observed that the alleged employers' "lease agreements" with its cabdrivers constituted an attempt to avoid the workers' compensation law (*id.* at p. 1297), and that " 'subterfuges [in fashioning business arrangements to avoid the workers' compensation law] are not countenanced.' " (*Ibid.,* quoting *Borello, supra,* 48 Cal.3d at p. 349.) (See also *Rinaldi* v. *Workers' Comp. Appeals Bd.* (1991) 227 Cal.App.3d 756 [278 Cal.Rptr. 105] [almond harvesters were deemed employees of the growers].)

In the present case, the WCJ applied the analysis recited in *Borello* and found that IBD's independent contractor agreement with petitioner was a

subterfuge designed to avoid the expense and consequences of the workers' compensation law. When WCAB sent the matter back to the WCJ upon the first reconsideration for "a more exacting analysis" under *Borello*, it noted that the contract itself should not be the focus of the WCJ's review. However, when it reviewed the WCJ's amended opinion on decision and rejected the WCJ's conclusion, WCAB began its own analysis with the observation that the worker's express or implied agreement is "significant." WCAB cited the *Borello* decision. It then analyzed the undisputed facts in the record according to the factors set forth in *Borello*. In reaching a decision contrary to that of the WCJ, WCAB interpreted those facts far differently than had the WCJ.

In its reviews, WCAB also cited four of its own decisions involving newspaper carriers and attempted to distinguish those decisions.[3] We note that in *Los Angeles Herald Examiner* v. *WCAB (Rocha)*, *supra*, 58 Cal.Comp.Cases 224—a case with facts very similar to those involved here—WCAB found the carrier was an employee despite an independent contractor agreement. In that case, WCAB reasoned that the carrier was an employee because, in delivering the newspapers to newsracks and residences, the hauler did not exercise significant control over the work, did not invest in equipment and materials, and the work did not require any special skills beyond that of a regular employee. We see no significant difference between the circumstances of the *Herald Examiner*'s hauler and those of petitioner.

WCAB placed its greatest reliance on *State Compensation Ins. Fund* v. *Brown* (1995) 32 Cal.App.4th 188 [38 Cal.Rptr.2d 98], after relying heavily in its first opinion on the United States Supreme Court's opinion in *United States* v. *Silk* (1947) 331 U.S. 704 [91 L.Ed. 1757, 67 S.Ct. 1463], a case involving truckers who picked up coal from railroad cars and then delivered

---

[3]*Los Angeles Herald Examiner* v. *WCAB (Rocha)* (1993) 58 Cal.Comp.Cases 224 (holding a newspaper "hauler" was an employee despite an independent contractor agreement); *Freedom Newspapers, Inc.* v. *WCAB (Southern)* (1985) 50 Cal.Comp.Cases 328 (holding the carrier was an employee where he was required to follow certain routes and to deliver by 6 a.m. though he purchased his papers at wholesale and sold at retail—because in part customers paid the newspaper directly); *Northwest Publications* v. *WCAB (McEvoy)* (1977) 42 Cal.Comp.Cases 552 (holding a carrier was an employee despite an independent contractor agreement requiring him to purchase the papers at wholesale, to deliver them in his own vehicle and to sell them at retail with the difference between the wholesale cost and retail price being his compensation); *Cypress Insurance Company* v. *WCAB (Romero)* (1976) 41 Cal.Comp.Cases 124 (holding a carrier who had signed an agreement to deliver papers was an employee where the carrier did not take title to newspapers he delivered, he was not charged for lost papers, and the newspaper collected from customers and did not deduct from the carrier's compensation for customer accounts in default).

it on behalf of a retail coal dealer. WCAB's reliance on these cases is misplaced. *Brown* was a civil suit, brought by the State Compensation Insurance Fund, against a business that had refused to pay certain insurance premiums on the ground that the "employees" covered were really independent truckers. The Court of Appeal agreed, and noted that "[c]lassifying a worker as employee or independent contractor . . . is a quintessentially adjudicatory function involving the interpretation of statutes defining employees for the purposes of the Workers' Compensation Act. In such matters, our review of an agency interpretation of its controlling statutes is respectful but nondeferential." (*Brown, supra,* 32 Cal.App.4th at p. 199.) The *Brown* court pointed out that independent truckers or haulers constitute a distinct occupation and industry and have considerable control over their work and over workplace safety.

There is a quantum leap between these truckers and the individuals who deliver newspapers. In this age, most employees utilize automobiles, and such vehicles are not specialized equipment. A trucker who owns his truck not only needs a special class of driver's license but must learn many special driving skills (e.g., how to back up to loading dock without jackknifing the rig). The investment in a truck is far greater than an investment in a car, pickup or van that frequently serves also as a family all-purpose vehicle. Finally, the skill and expertise necessary to handle a load of coal or other product greatly exceeds that required to deliver newspapers. In fact, for most of this century, this occupation was the first remunerated employment of many young people who rode bicycles to deliver newspapers in their neighborhoods. Certainly no special skills or experience are required to deliver newspapers.

WCAB notes that petitioner delivered for other newspapers while delivering for IBD. While that circumstance may suggest independent contractor status, the additional deliveries conclusively reveal only the economic necessity of an additional source of income.

Moreover, the Supreme Court in *Borello,* in affording unskilled, low-paid workers the protection of workers' compensation, aptly observed the economic and social realities involved in the relationship between the growers and the cucumber sharefarmers. (48 Cal.3d at pp. 358-359.) It also acknowledged that another economic and societal concern of the workers' compensation laws was to insulate employers from tort liability in the civil courts. (*Id.* at p. 354.) Indeed, if workers' compensation is significantly limited, experience has shown, injured employees file more direct tort suits. The result is further crowding of the civil trial courts, and many of these suits

will be successful with additional burdensome economic consequences. Strict interpretations, such as WCAB's ruling here, defeat one of the major purposes of workers' compensation: to fashion a largely no-fault system with broad liability and relatively limited financial recovery.

Where, as here, the evidence is undisputed, the question of employee status is one of law, although deference to the agency's view is appropriate. (*Borello, supra*, 48 Cal.3d 341, 349.) ■ When we apply the analysis set forth in *Borello,* we conclude, as the Supreme Court did in *Borello,* that the agency's conclusion is erroneous.

According to *Borello*, as previously noted, the traditional and key test of an employment relationship is whether the principal to whom the service is rendered has the right to control the manner and means of accomplishing the result desired. (*Borello, supra*, 48 Cal.3d at p. 350.) With respect to the delivery of IBD's newspapers, petitioner had very little control over the mode and manner in which he performed his service. IBD specified the time at which the newspapers were to be picked up for distribution and specified the time each day by which the newspapers were to be delivered to the customers. IBD furnished both the customers and the routes by which the customers were served. Petitioner had almost no interaction with the customers, as the customers paid their subscription fees directly to IBD and rendered complaints about delivery directly to IBD. Although IBD's supervision of the performance of the services was indirect, it was focused on and totally responsive to the complaints received from customers. With respect to the control test, *Borello* emphasized that strong evidence in support of an employment relationship for workers' compensation purposes is provided by the alleged employer's right to discharge at will, without cause. The carrier contract between IBD and petitioner required two weeks' notice. However, financial consequences accrued only to the carrier in the event the carrier failed to give the two weeks' notice, in which case the carrier was obligated to indemnify IBD for two weeks of carrier services. IBD acknowledged that it could discharge carriers on the spot and occasionally did so. The contract provided no consequences where IBD gave less than two weeks' notice. These circumstances strongly indicate an employment relationship.

Consideration of other factors cited in *Borello* further compels a finding that petitioner's services were as an employee for the purposes of the protective legislation. As previously noted, IBD, though purporting to relinquish supervision of the delivery of the newspapers, retained overall control of this function. It retained ownership of the newspapers until delivered, did not charge carriers for lost or misplaced papers, collected subscription fees

directly from the subscribers, and received complaints about the manner in which deliveries were made.

The carriers made no capital investment aside from their vehicles, which in Los Angeles are generally necessary for any employment. No other tools were required. IBD furnished bags and rubber bands. As we have noted, the performance of the delivery of newspapers was a form of manual labor requiring no special skill other than the ability to drive a motor vehicle. Petitioner's remuneration as a carrier did not depend upon his initiative, his judgment, or his managerial abilities. He merely had to deliver all the newspapers on the route. There was only one way to deliver the newspapers, and all the carriers performed their function essentially in the same manner. As in *Borello*, "[d]iligence and quality control are achieved by the payment system, essentially a variation of [a] piecework formula . . . ." (*Borello, supra*, 48 Cal.3d at p. 357.) Petitioner was simply paid by the number of routes he completed per day. As did the harvesters in relationship to the growers' business operations, newspaper carriers form a regular, integrated portion of IBD's business operation. (*Ibid.*) Moreover, no finite time of service was involved as is normally the case with a true independent contractor relationship. The services petitioner provided were ongoing and permanent. This circumstance is highly indicative of an employment relationship.

Finally, there was no indication that petitioner had any real choice of terms of employment or contract. The preprinted fill-in-the-blanks agreement form was not subject to any negotiation between IBD and petitioner, whose limited language skills prevented him from reading the contract, which was in English. Evidence at the hearing before the WCJ indicated that some parts of the contract were explained orally to petitioner, but no evidence was presented indicating the contract had been read verbatim to him. The totality of the circumstances substantiates the WCJ's conclusion that IBD's carrier agreement, which purported to "disavow" an employer-employee relationship, was a subterfuge to avoid the workers' compensation laws of California. "The label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced." (*Borello, supra*, 48 Cal.3d at p. 349.)

Accordingly, we hold as a matter of law that IBD failed to demonstrate that petitioner was an independent contractor excluded from coverage under the Workers' Compensation Act. We therefore reverse the decision of WCAB and its order that petitioner take nothing by reason of his claim for workers' compensation benefits.

DISPOSITION

The May 15, 1995, order of the WCAB is reversed. The WCAB is ordered to enter a new and different order sustaining petitioner's claim for workers' compensation benefits.

Fukuto, J., and Nott, J., concurred.