Filed 9/30/21

**<u>CERTIFIED FOR PUBLICATION</u>**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| VERONICA BECERRA et al., | F074680 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 08CECG04411) |
| THE MCCLATCHY COMPANY et al., | **OPINION** |
| Defendants and Respondents. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County. Kristi Culver Kapetan, Judge.

Callahan & Blaine, Daniel J. Callahan, Michael J. Sachs, and Scott D. Nelson for Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith, Allison Arabian and John S. Poulos; Law Offices of William C. Hahesy and William C. Hahesy; Perkins Coie, Eric D. Miller and Jill L. Ripke; Pillsbury Winthrop Shaw Pittman and Derek M. Mayor for Defendants and Respondents.

-ooOoo-

## INTRODUCTION

This appeal arises from a class action brought by and on behalf of newspaper home delivery carriers for The Fresno Bee newspaper (hereinafter plaintiffs or the carriers).[1] In the trial court, the matter proceeded to a bifurcated bench trial on the issue of whether the owner of The Fresno Bee and its holding company, respectively, The McClatchy Company and McClatchy Newspapers, Inc. (hereinafter collectively referred to as the newspaper or The Bee), violated the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) by failing to pay the carriers' mileage expenses as required by Labor Code section 2802. The primary issue at trial was whether the carriers were employees or independent contractors. The trial court determined the carriers were independent contractors and, as a result, entered judgment in favor of The Bee.

On appeal, the carriers contend (1) the trial court misallocated the burden of proof; (2) the trial court erred in relying on a regulation promulgated by the Employment Development Department (EDD), which the carriers contend is irrelevant; (3) the trial court erred in its application of the relevant test, as set out in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, (*Borello*); (4) under *Borello*, the carriers are employees; (5) the trial court erred in relying on equitable considerations to determine The Bee's liability; and (6) the trial court improperly relied on testimony from unrepresentative class members. In supplemental briefing, the carriers additionally argue the test for employment set out in *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903 (*Dynamex*) applies, and the carriers are employees under that test.

We agree that the question of whether the carriers are employees or independent contractors must be determined under the *Borello* test. As such, the trial court erred in

---

[1] Appellants are: Veronica Becerra, Williams Herrera Luis, Vanessa Castro, Alma Landeros, Randy Leyva, and Roger Carpenter.

deferring to the EDD regulations, which we conclude are inapplicable. Ultimately, the trial court also failed to properly analyze the factors required by *Borello*, and we therefore must reverse. However, we decline to resolve whether the carriers are employees or independent contractors, and instead remand for the trial court to address this question in light of the principles set forth herein. We address the carriers' remaining arguments to the extent necessary to provide guidance on remand.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.      Contracts for Delivery of The Bee**

Between December 19, 2004, and January 2010, all the carriers signed a contract with The Bee to provide newspaper home delivery services. Although there were some variations in the contracts used at different times during this period, the differences were not substantial. The contracts were titled, "Independent Contractor Home Delivery Distribution Agreement" (boldface & some capitalization omitted) and referred to the carriers as "Contractor."

The contracts contained a paragraph titled, "**Independent Contractor Status**,"[2] which stated:

> "Contractor represents that it operates an independently established business and desires to contract with [the newspaper] to distribute newspapers and other materials as an independent contractor. Contractor's agreement to provide results under this Agreement as an independent contractor for all purposes is an essential term of this Agreement. . . . Contractor may operate Contractor's business as Contractor chooses. [The newspaper] is interested only in the results to be obtained by Contractor as described in this Agreement, and the manner and means of obtaining those results are matters entirely within the authority and discretion of Contractor. For example, Contractor is (a) free to obtain and utilize one or more vehicles of Contractor's selection; (b) free to set Contractor's own working hours; (c) free to set Contractor's own order of deliveries; (d) free to purchase equipment and supplies wherever Contractor chooses; (e) not subject to the [newspaper's] rules and regulations for its employees; (f) not

---

[2]      We quote from the contract contained in trial exhibit 109.

required or requested to attend meetings of the employees of [the newspaper]; (g) free to perform distribution services for other companies, including but not limited to competitors of [the newspaper]; and (h) free to hire or retain employees or subcontractors to perform Contractor's obligations pursuant to this Agreement, even if Contractor is an individual and not a corporation or other business organization. Publisher has no authority to impose disciplinary action upon Contractor and may only assert rights available to it under this Agreement or as available under application law."

The contracts also specified that the carriers would be treated as independent contractors for tax purposes.

The contracts provided space to fill in the location and time the carrier could pick up the newspapers and related materials for delivery. Pursuant to the contract, the carriers each agreed to "assemble and deliver a complete newspaper on the date published in a dry and undamaged condition to each subscriber on the Subscriber List at a time and at a place that satisfies the reasonable delivery requests of each subscriber." The contracts included blank spaces for the newspaper to specify a time by which the newspapers were to be delivered, and stated that "delivery to a porch, driveway, or tube, as requested by [the] subscriber" would be considered reasonable. The carriers were prohibited from encouraging subscribers to change their delivery location and from providing copies of the newspaper to others, with limited exceptions. The carriers also were prohibited from including markings, stampings, inserts or imprinted wrapping, coverings or containers not pre-approved by The Bee. Additionally, the newspaper was not to be delivered in damaged, soiled, or wet condition.

The contracts required the carriers to agree to avoid missed or damaged deliveries, or deliveries to unsatisfactory locations. The contracts contained blank spaces to specify the amount the newspaper would charge carriers for various types of complaints. Carriers were prohibited from deterring subscribers from contacting the newspaper with complaints. If the newspaper received a specified number of complaints regarding a carrier, the contract was subject to termination.

4.

The carriers were required to furnish and maintain their own vehicles and equipment. Carriers had the option to purchase delivery supplies, such as bags and rubber bands, from the newspaper and were invoiced for such supplies each billing cycle. Carriers had the right to hire employees, subcontractors or substitutes to assist in the performance of the agreement. Carriers were required to either deposit a cash bond with the newspaper or to purchase a commercial bond, and to maintain various types of insurance and any necessary licenses. The carriers assumed all risk of loss regarding the newspapers once the newspapers were made available for delivery.

Early agreements during this period required the carriers to purchase and resell the newspapers being distributed. Later agreements provided that carriers were paid a piece rate, i.e., a specified amount for each newspaper delivered.

The agreement could be terminated without cause upon 35 days' written notice. The agreement also could be terminated without notice for a material breach.

## II.    Initial Proceedings

On December 19, 2008, the carriers filed, on behalf of themselves and others similarly situated, a putative class action complaint against The Bee. On June 6, 2013, the carriers filed the operative pleading, a second amended complaint consisting of nine causes of action: (1) failure to pay minimum wages and overtime wages (Lab. Code, §§ 1194, 1197, 1197.1; Industrial Welfare Commission (IWC) Wage Order No. 1-2001; Cal. Code Regs., tit. 8, § 11010); (2) failure to provide meal periods or compensation in lieu thereof (Lab. Code, §§ 226.7, 512; IWC Wage Order No. 1-2001; Cal. Code Regs., tit. 8, § 11010); (3) failure to provide rest periods or compensation in lieu thereof (Lab. Code, § 226.7; IWC Wage Order No. 1-2001; Cal. Code Regs., tit. 8, § 11010); (4) failure to reimburse reasonable expenses (Lab. Code, § 2802); (5) unlawful deductions from wages (Lab. Code, §§ 221, 223); (6) failure to pay for training (29 C.F.R. § 785.27 et seq.); (7) failure to provide itemized wage statements (Lab. Code,

5.

§§ 226, 226.3); (8) failure to keep accurate payroll records (Lab. Code, § 1174); and (9) unfair business practices (Bus. & Prof. Code, § 17200 et seq.).

On July 15, 2013, the trial court certified a class as to the fourth, seventh, eighth, and ninth causes of action as follows: " 'All individuals currently or formerly engaged by [the newspaper] as newspaper home delivery carriers of [T]he Fresno Bee newspaper, who signed contracts directly with [the newspaper] in the State of California, between December 19, 2004 and January, 2010.' " Omitted from the class were carrier substitutes, single-copy carriers, and helpers.

On January 9, 2014, the trial court granted the newspaper's motion for judgment on the pleadings as to the eighth cause of action. The carriers then moved for a separate trial on the ninth cause of action. After the trial court denied the motion for a separate trial, the carriers sought to dismiss their fourth and seventh causes of action, as well as their individual claims. Following a case management conference, the parties filed, and on March 25, 2014, the court approved, the following "**STIPULATION AND FURTHER RECITALS**" regarding the remaining claims:

"1.     At the conference, the parties and the Court discussed a number of subjects and the Court made various rulings thereon, some of which will be reflected in this stipulation and further orders of the Court. [The carriers] are voluntarily dismissing, without prejudice, the Fourth Cause of Action under Labor Code Section 2802 and the Seventh Cause of Action under Labor Code Sections 226 and 226.3, along with all of [the carriers'] individual claims, subject to Court approval. [The carriers] have filed a Declaration consistent with Rule 3.770 of the California Rules of Court. [The carriers] confirm that they will be proceeding solely with their Ninth Cause of Action under Business [and] Professions Code Section 17200.

"2.     The Court has determined that the case shall be bifurcated for trial and certain discovery. The Court has determined that the trial shall be bifurcated into two phases . . . . The first phase will involve a trial of the employee/independent contractor status of the class members and the remaining liability issues including the issues relating to the reasonable and necessary automobile expenses incurred by the class members and not

6.

indemnified. Because [the carriers] have the burden of proof on those issues, they will proceed first. Only if [the carriers] are able to prove that the class members are employees and the other liability elements would the parties proceed to the second phase. The second phase, if necessary, would concern only the issue of restitution for unindemnified reasonable and necessary automobile expenses."

### III. Trial and Judgment

A bifurcated bench trial on the issue of liability on the ninth cause of action commenced on November 19, 2014, and continued over the course of numerous nonconsecutive days, with the presentation of evidence concluding on March 4, 2015.

On July 2, 2015, the trial court denied the newspaper's motion to decertify the class. However, the trial court also ordered briefing and argument on "the issue of creating a subclass or, in the alternative, excluding from the class, regional carriers and/or large distributors." After receiving further briefing, on September 28, 2015, the trial court excluded "large distributors" from the class and declined to create a subclass of regional carriers.

On September 9, 2016, the trial court issued its statement of decision, concluding the carriers were properly classified as independent contractors, rather than employees. The court began its analysis by considering the effect of section 4304-6 of title 22 of the California Code of Regulations,[3] which was promulgated by the EDD and which contains factors to be considered in determining whether newspaper carriers are employees or independent contractors for purposes of the Unemployment Insurance Code. The court determined it was required to "analyze the language of the contracts [between the carriers and the newspaper] with a view to both the common law, and the common law as specifically applied by the [EDD] to the newspaper industry." Accordingly, the court examined the contracts "[w]ithin the framework of the [EDD] regulations," and based

---

[3] Subsequent regulatory citations refer to California Code of Regulations, title 22.

7.

thereon, determined the carriers acted with independence, free from the control of the newspaper.

The court then stated, "Even if the court did not consider the EDD Regulations, application of the [common law] factors . . . would lead to the same conclusion." The court then examined 14 "secondary factors" bearing on the independent contractor determination, some of which suggested the carriers were independent contractors rather than employees. The court declined to consider two cases relied on by the carriers, *Brose v. Union-Tribune Publishing Co.* (1986) 183 Cal.App.3d 1079 and *Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839 (*Poizner*), on the ground these cases were limited to claims arising under the Workers' Compensation Act. Finally, the court noted that this is an action in equity, and that it would be "unfair for [T]he Bee to be penalized for relying upon the [EDD] Regulations and following them." The court thereby concluded that both the EDD regulations and the common law test supported a conclusion that the carriers were properly classified as independent contractors.

On September 15, 2016, the court entered judgment in favor of the newspaper. This timely appeal followed.[4]

---

[4] During the pendency of this appeal, the newspaper filed a voluntary bankruptcy petition and the appeal was stayed. (11 U.S.C. § 362.) On September 25, 2020, the bankruptcy court filed its "Findings of Fact, Conclusions of Law, and Order Approving the Disclosure Statement and Confirming the First Amended Joint Chapter 11 Plan of Distribution of JCK Legacy Company and its Affiliated Debtors and Debtors in Possession." (Boldface, underlining & some capitalization omitted.) This order terminated the automatic bankruptcy stay and, on February 8, 2021, the stay of appeal was lifted. At the same time, we ordered the parties to brief whether the bankruptcy court's order rendered the appeal moot.

An appeal becomes moot when " ' " 'the occurrence of events renders it impossible for the appellate court to grant appellant any effective relief.' " ' " (*La Mirada Avenue Neighborhood Assn. of Hollywood v. City of Los Angeles* (2016) 2 Cal.App.5th 586, 590; accord, *Paul v. Milk Depots, Inc.* (1964) 62 Cal.2d 129, 132.) Generally, the burden is on the party claiming mootness to establish that an appeal is moot. (See *Smith v. State Savings & Loan Assn.* (1985) 175 Cal.App.3d 1092, 1099-1100.) Here, the parties responded to the court's request for further briefing with a

## DISCUSSION

### I. Motions for Judicial Notice

In the course of briefing the instant appeal, the carriers filed two motions for judicial notice, both of which the newspaper opposed.

A reviewing court must take judicial notice of "(1) each matter properly noticed by the trial court and (2) each matter that the trial court was required to notice under [Evidence Code s]ection 451 or 453." (Evid. Code, § 459, subd. (a).) In addition, a reviewing court has discretion to take judicial notice of any matter specified in Evidence Code section 452. (Evid. Code, § 459, subd. (a).)

#### A. Motion Filed November 6, 2017

The carriers' first motion seeks judicial notice of (1) a 2002 update of the Division of Labor Standards Enforcement (DLSE) Enforcement Policies and Interpretations Manual (Revised) section 28 (Exhibit A); (2) a DLSE opinion letter dated May 17, 2000 (Exhibit B); (3) a Department of Industrial Relations (DIR) publication entitled "Independent Contractors" (Exhibit C); (4) a purported DIR webpage concerning independent contractors (Exhibit D); (5) the EDD rulemaking file concerning section 4304-6 of the California Code of Regulations (Exhibit E); and (6) section 4304-6 of the California Code of Regulations (Exhibit F).

Both parties sought judicial notice of Exhibit F in the trial court and the trial court granted their request. We will grant the carriers' motion to take judicial notice of Exhibit F. (Evid. Code, § 459, subd. (a).)

---

stipulation, which suggests that effective relief remains available to the carriers should they prevail in this appeal. Accordingly, the newspaper has not established that the appeal is moot, and we will proceed to address the appeal on the merits.

9.

As to the remaining exhibits, our determination is discretionary.[5]  (Evid. Code, § 459, subd. (a).)

Our Supreme Court recently noted that the provisions of the DLSE manual contained in Exhibit A are not entitled to deference, and a party's reliance on the manual was therefore found unpersuasive.  (*Dynamex*, *supra*, 4 Cal.5th at p. 946.)  While we are not prohibited from considering this material (see *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 559), it carries little weight.  Thus, while we will grant the carriers' request for judicial notice of Exhibit A, we remain mindful of our duty to independently determine the meaning and scope of the provisions at issue in this case without deference to this material.

Likewise, Exhibit B is not entitled to deference.  (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1029, fn. 11 (*Brinker*) [DLSE opinion letters are not controlling].)  Nor is it relevant.  We will deny the carriers' request for judicial notice of Exhibit B.  (*Stockton Citizens for Sensible Planning v. City of Stockton* (2012) 210 Cal.App.4th 1484, 1488, fn. 3 (*Stockton*).)

Exhibits C and D are interpretive documents.  Like Exhibits A and B, they are not entitled to deference.  (*Martinez v. Combs* (2010) 49 Cal.4th 35, 50, fn. 15 ["[W]e give the DLSE's current enforcement policies no deference because they were not adopted in compliance with the Administrative Procedure Act."]; *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 576 [declining to give weight to DLSE policy interpretations].)  Moreover, these documents are dated well after the conclusion of the

---

**5**    In the trial court, the carriers' cited Exhibit A and Exhibit B in their objections to the trial court's proposed statement of decision, but did not request judicial notice.  Nor do the carriers contend they sought judicial notice of Exhibits C and E in the trial court.  The trial court denied the carriers' request for judicial notice of Exhibit D because the document was not authenticated and was not shown to be an official agency act.

class period.  They are not relevant, and we will therefore deny the request for judicial notice on that basis.  (*Stockton*, *supra*, 210 Cal.App.4th at p. 1488, fn. 3.)

Exhibit E is the rulemaking file for the regulation at the heart of this case, section 4304-6 of the California Code of Regulations.  The rulemaking file is the mandatory record of the rulemaking proceeding.  (Gov. Code, § 11347.3, subd. (a).)  It must contain, among other things, a statement of reasons for the regulation, supporting data, and petitions from interested persons.  (Gov. Code, § 11347.3, subd. (b).)  A rulemaking file is the proper subject of judicial notice (see *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 188), and indeed ensures effective judicial review of contested regulations.  (*POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 744.)  The newspaper presents no reason to deny judicial notice, other than that judicial notice was not requested below.  We will exercise our discretion to grant judicial notice as to Exhibit E.

Accordingly, we grant the carriers' November 6, 2017 motion for judicial notice as to Exhibits A, E, and F.  In all other respects, the motion is denied.

## B. Motion Filed August 14, 2018

In their second motion, the carriers request that we take judicial notice of the statement of decision for phase 1 of the trial in Sacramento County Superior Court case No. 34-2009-00033950, *Sawin, et al. v. The McClatchy Company, et al.* (*Sawin*).  According to the carriers, the court in *Sawin* applied the correct legal test, thereby demonstrating that the trial court in the instant case applied an incorrect test.  The carriers assert the facts in *Sawin* are "nearly identical" to those at issue here.  The newspaper argues *Sawin* is irrelevant and, in any event, that this court may not judicially notice the truth of the facts set forth in that decision.

Under Evidence Code section 452, subdivision (d), a court may take judicial notice of the records of any court of this state.  The statement of decision in *Sawin* is indisputably a record of a court within the State of California and is therefore a proper

subject of judicial notice. In *Sawin*, the court applied *Borello* and its progeny to conclude that a class of newspaper carriers were employees, not independent contractors. However, the *Sawin* decision has no binding or precedential effect. (*Harrott v. County of Kings* (2001) 25 Cal.4th 1138, 1148.) It has, at most, some persuasive value. Although we grant the carriers' August 14, 2018 motion for judicial notice, we again remain mindful of the limited relevance of this material.

## II.    *Borello* Governs the Carriers' Claim

The trial court concluded the carriers were properly classified as independent contractors on two grounds. First, the court concluded the carriers were properly classified as independent contractors based on the factors set forth in section 4304-6 of the California Code of Regulations (section 4304-6). Second, the court concluded the carriers were properly classified as independent contractors under the common law test.

In this section, we explain that the determination of whether the carriers were employees or independent contractors for purposes of Labor Code section 2802 is governed by the common law test set out in *Borello* and its progeny. Although the law governing independent contractor and employee status has changed significantly since the trial in this case (see *Dynamex*, *supra*, 4 Cal.5th 903; see also Assem. Bill No. 5 (2019-2020 Reg. Sess.) Stats. 2019, ch. 296, § 1), those changes do not apply to the carriers' claim. Further, as we explain, the EDD regulations relied on by the trial court are inapplicable to the carriers' claim that the newspaper engaged in unfair competition by violating Labor Code section 2802. *Borello* remains the governing standard.

### A.    The Common Law Test

At common law, the question of whether a worker should be classified as an employee or an independent contractor initially arose in the tort context to determine whether a hirer should be held vicariously liable for an injury resulting from a worker's actions. (*Dynamex*, *supra*, 4 Cal.5th at p. 927; *Borello*, *supra*, 48 Cal.3d at p. 350.) In this context, "the 'control of details' test" had long been "the principal measure of the

12.

servant's status for common law purposes." (*Borello*, *supra*, 48 Cal.3d at p. 350.) Under the control of details test, " '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.' " (*Ibid.*) Our Supreme Court eventually extended the control of details test beyond the tort context to determine whether workers should be considered employees or independent contractors for purposes of "the variety of 20th century social welfare legislation that had been enacted for the protection of employees." (*Dynamex*, at p. 927; see *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 946 [unemployment insurance]; *Isenberg v. California Emp. Stab. Com.* (1947) 30 Cal.2d 34, 35, 39 [same]; *Perguica v. Ind. Acc. Com.* (1947) 29 Cal.2d 857, 858-861 [workers' compensation]; *Empire Star Mines Co. v. Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43-44 [unemployment insurance], overruled on another ground in *People v. Sims* (1982) 32 Cal.3d 468, 479-480, fn. 8.)

In addition to the control of details, a number of " 'secondary' " factors were also held relevant to the common law determination of an employment relationship. (*Dynamex*, *supra*, 4 Cal.5th at p. 928; accord, *Borello*, *supra*, 48 Cal.3d at pp. 350-351.) Foremost among these secondary factors was the hiring entity's right to discharge a worker at will, without cause, which was considered " '[s]trong evidence in support of an employment relationship.' " (*Borello*, at p. 350; accord, *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 531 (*Ayala*).) Additionally, the following factors derived from the Restatement Second of Agency section 220 were held to be relevant: "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of

payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Borello*, *supra*, 48 Cal.3d at p. 351; accord, *Dynamex*, *supra*, 4 Cal.5th at p. 928.)

In 1989, our Supreme Court decided *Borello*, which has been characterized since as the "seminal decision" on the appropriate standard for distinguishing between employees and independent contractors. (*Dynamex*, *supra*, 4 Cal.5th at p. 929.) *Borello* involved a controversy over whether agricultural laborers hired to harvest cucumbers pursuant to a " 'sharefarmer' " agreement were independent contractors or employees for purposes of California's workers' compensation statutes, where the grower did not directly supervise the harvest and compensated the farmworkers based on the quantity, size, and quality of the cucumbers harvested. (*Borello*, *supra*, 48 Cal.3d at pp. 345-347.) The grower argued the farmworkers were independent contractors under the control of details test because "they manage[d] their own labor, share[d] the profit or loss from the crop, and agree[d] in writing that they [were] not employees." (*Id.* at p. 345.) However, the high court rejected this contention, summarizing its conclusion as follows:

> "The grower controls the agricultural operations on its premises from planting to sale of the crops. It simply chooses to accomplish one integrated step in the production of one such crop by means of worker incentives rather than direct supervision. It thereby retains all necessary control over a job which can be done only one way. [¶] Moreover, so far as the record discloses, the harvesters' work, though seasonal by nature, follows the usual line of an employee. In no practical sense are the 'sharefarmers' entrepreneurs operating independent businesses for their own accounts; they and their families are obvious members of the broad class to which workers' compensation protection is intended to apply." (*Borello*, at p. 345.)

Accordingly, the court concluded the farmworkers were employees as a matter of law. (*Id.* at p. 346.)

In reaching this conclusion, the *Borello* court acknowledged that the hiring entity's right to control necessary work details is the " 'most important' or 'most significant' " consideration. (*Borello*, *supra*, 48 Cal.3d at p. 350.) However, the court also recognized the relevance of the secondary factors listed above, the standards set forth for contractor's licensees under Labor Code section 2750.5,[6] and a six-factor test developed in other jurisdictions.[7] (*Borello*, at pp. 354-355.)

Additionally, the court recognized that the concept of " 'employment' " for purposes of the Workers' Compensation Act "is not inherently limited by common law principles." (*Borello*, *supra*, 48 Cal.3d at p. 351.) Instead, the "definition of the employment relationship must be construed with particular reference to the 'history and fundamental purposes' of the statute." (*Ibid.*) Thus, our Supreme Court has recently characterized the *Borello* test as "calling for resolution of the employee or independent contractor question by focusing on the intended scope and purposes of the particular statutory provision or provisions at issue. In other words, *Borello* calls for application of a *statutory purpose* standard that considers the control of details and other potentially relevant factors identified in prior California and out-of-state cases in order to determine which classification (employee or independent contractor) best effectuates the underlying

---

[6]     Under Labor Code section 2750.5, proof of independent contractor status must include proof "(a) That the individual has the right to control and discretion as to the manner of performance of the contract for services in that the result of the work and not the means by which it is accomplished is the primary factor bargained for. [¶] (b) That the individual is customarily engaged in an independently established business. [¶] (c) That the individual's independent contractor status is bona fide and not a subterfuge to avoid employee status." (*Ibid.*)

[7]     "Besides the 'right to control the work,' the [six] factors include (1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business." (*Borello*, *supra*, 48 Cal.3d at pp. 354-355.)

legislative intent and objective of the statutory scheme at issue." (*Dynamex*, *supra*, 4 Cal.5th at p. 934.)

## B. Recent Changes to Employee and Independent Contractor Status

Our Supreme Court and the Legislature have recently departed from the *Borello* test for distinguishing between employees and independent contractors in certain circumstances. We requested supplemental briefing on some of these changes. The newspaper filed an application for permission to file a supplemental brief addressing others.[8] We now address the current state of the law. As we explain, despite these changes, *Borello* remains the applicable test for determining whether the carriers were independent contractors or employees.

### i. *Dynamex*

In 2018, our Supreme Court issued its opinion in *Dynamex*, *supra*, 4 Cal.5th 903. Although the underlying litigation in *Dynamex* involved a variety of claims, our Supreme Court considered only a single issue: "[W]hat standard applies, under California law, in determining whether workers should be classified as employees or as independent contractors *for purposes of California wage orders*, which impose obligations relating to the minimum wages, maximum hours, and a limited number of very basic working conditions (such as minimally required meal and rest breaks) of California employees." (*Id.* at pp. 913-914; see *id*. at p. 919.) In that context, our Supreme Court determined that the phrase "suffer or permit to work," which is contained in the definition of "employ" in the applicable wage order, is the applicable standard for distinguishing employees from independent contractors for purposes of wage order claims. (*Id.* at pp. 943-944.) Our

---

[8] The newspaper filed its application for permission to file a supplemental brief on November 19, 2019. We deferred consideration of the motion pending consideration of the appeal on the merits. Since that time, the parties have filed a stipulation that this court may issue its opinion "without oral argument or further input from the Parties." Accordingly, we deny the newspaper's November 19, 2019 application for permission to file a supplemental brief.

Supreme Court then announced that, under that standard, a worker should be considered an employee unless the hiring entity establishes "(A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." (*Id.* at p. 957.) This test, commonly referred to as the "ABC" test (see *id.* at p. 916), differs significantly from the *Borello* test.

Since *Dynamex*, courts have declined to extend the ABC test, as set out in *Dynamex*, outside the context of wage orders and related Labor Code claims. (See, e.g., *Vendor Surveillance Corporation v. Henning* (2021) 62 Cal.App.5th 59, 68-69 (*Vendor Surveillance*) [declining to extend *Dynamex* to claims relating to failure to pay unemployment insurance tax]; *Garcia v. Border Transportation Group, LLC* (2018) 28 Cal.App.5th 558, 570-572 (*Garcia*) [declining to extend *Dynamex* to non-wage order claims for overtime, wrongful termination in violation of public policy, waiting time penalties, and UCL claims resting on such violations]; see also *Vazquez v. Jan-Pro Franchising International, Inc.* (2021) 10 Cal.5th 944, 951-952 (*Vazquez*) [stating that *Dynamex* "was based upon a determination concerning how the term 'suffer or permit to work' in California wage orders should be interpreted for purposes of distinguishing between employees who are covered by the wage orders and independent contractors who are not," and that *Dynamex* did not overrule any prior Supreme Court decision or disapprove any prior Court of Appeal decision].) Additionally, although our Supreme Court has concluded that the *Dynamex* interpretation of the phrase "suffer or permit to work" applies retroactively, this holding was limited to nonfinal cases governed by wage orders worded similarly to that in *Dynamex*. (*Vazquez*, at pp. 949-952.)

In sum, the *Dynamex* ABC test is limited to claims governed by wage orders that employ the "suffer or permit to work" standard.  Here, the carriers proceeded to trial on a UCL claim, which was based on the newspapers' alleged violation of Labor Code section 2802.[9]  At least one court has characterized claims for business-related transportation expenses brought pursuant to Labor Code section 2802 as non-wage-order claims.  (See *Dynamex*, *supra*, 4 Cal.5th at pp. 915, 916, fn. 5, 942 [discussing holding of the Court of Appeal].)  We agree and conclude that neither the carriers' UCL claim nor the Labor Code violation it is based upon relies on a wage order to distinguish between employees and independent contractors.  (See *Garcia*, *supra*, 28 Cal.App.5th at pp. 570-571.)  *Dynamex* does not provide a basis for applying the ABC test to the carriers' claims.

### ii. Subsequent Legislation

"After *Dynamex* was decided, the Legislature enacted Assembly Bill [No.] 5 [2019-2020 Reg. Sess.] (Stats. 2019, ch. 296), which amended both the Labor Code and Unemployment Insurance Code.  The stated legislative purpose in enacting Assembly Bill [No.] 5 was to 'codify' the *Dynamex* decision and to 'clarify' the decision's application in state law.  (Stats. 2019, ch. 296, § 1(d).)"  (*Vendor Surveillance*, *supra*, 62 Cal.App.5th at pp. 72-73, fn. omitted.)  To this end, the bill added former section 2750.3 to the Labor Code, which "broadly adopt[ed] the *Dynamex* holding for purposes of all benefits to which employees are entitled under the Unemployment Insurance Code, the Labor Code, and all applicable wage orders."[10]  (*People v. Uber Technologies* (2020) 56

---

**9** The carriers occasionally have asserted that their UCL claim is premised on Wage Order 1-2001, because subdivision (9) of this wage order "complements" and "applies" to Labor Code section 2802.

**10** Assembly Bill No. 5 (2019-2020 Reg. Sess.) also amended section 621 of the Unemployment Insurance Code, which previously distinguished between independent contractors and employees based on the "usual common law rules," and which now distinguishes between independent contractors and employees based on the ABC test. (Stats. 2019, ch. 296, § 5; see former Unemp. Ins. Code, § 621.)

Cal.App.5th 266, 277; see Stats. 2019, ch. 296, § 2.) Thus, under Labor Code former section 2750.3, a person providing labor or services for remuneration was to be considered an employee for purposes of the Labor Code and the Unemployment Insurance Code, unless the hiring entity established that the ABC test was satisfied. (Lab. Code, former § 2750.3, subd. (a)(1).) Labor Code former section 2750.3 specified that, with the exception of "wage orders of the Industrial Welfare Commission and violations of the Labor Code relating to wage orders," the ABC test was not retroactive but instead applied only to work performed on or after January 1, 2020. (Lab. Code, former § 2750.3, subd. (i)(1), (i)(3).)

In the same legislative session, the Legislature passed, and the Governor signed, Assembly Bill No. 170 (2019-2020 Reg. Sess.), which excluded newspaper carriers from the ABC test. (Stats. 2019, ch. 415, § 1; see Lab. Code, former § 2750.3, subd. (b)(7).) For newspaper carriers, determination of employee or independent contractor status was to be governed by *Borello*. (Lab. Code, former § 2750.3, subd. (b)(7).) The exclusion for newspaper workers initially was set to expire on January 1, 2021. (Lab. Code, former § 2750.3, subd. (b)(7)(B).)

The following year, the statutes regarding employee status and the application of the ABC test were "revise[d] and recast." (Stats. 2020, ch. 38; see Lab. Code, § 2775 et seq.) Under the revised statues, the ABC test remains the operative test for determining whether a worker is an employee for purposes of the Labor Code, the Unemployment Insurance Code, and all wage orders. (Lab. Code, § 2775, subd. (b)(1); see Stats. 2020, ch. 38, § 2.) However, newspaper carriers remain excepted from this rule, and their employment status continues to be determined by *Borello*. (Lab. Code, § 2783, subd. (h).) The exception for newspaper carriers now expires on January 1, 2022, unless extended by the Legislature. (Lab. Code, § 2783, subd. (h)(3).)

In sum, the Legislature has statutorily expanded the reach of the ABC test beyond the wage order context addressed in *Dynamex*. Nonetheless, the employee status of

newspaper carriers is, and was at the time the carriers' claims arose, determined by application of the *Borello* test. (See *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 10 ["Because the Labor Code does not expressly define 'employee' for purposes of section 2802, the common law test of employment applies."].) *Borello* governs the claim at issue here.

### C. Section 4304-6 is Inapplicable to the Carriers' Claim

The trial court relied in part on section 4304-6 of the California Code of Regulations – a regulation promulgated by the EDD – to conclude the carriers were properly classified as independent contractors. We conclude section 4304-6 is inapplicable to the carriers' claim that The Bee engaged in unfair competition by violating Labor Code section 2802.

### i. The Trial Court's Statement of Decision

In the trial court, the newspaper argued that section 4304-6 provided a safe harbor defense to the carriers' UCL claim. The trial court rejected this argument, a determination which is not challenged on appeal.

Nonetheless, the trial court found the regulation "relevant and persuasive" in determining the carriers were independent contractors. Indeed, the trial court determined the EDD regulations were entitled to "substantial deference" or at least carried "strong persuasive power" because they were promulgated by the EDD and pertained to a subject within the agency's jurisdiction. The trial court further surmised that the EDD regulations set forth the same factors as relied on at common law. The trial court therefore determined that the contract and the trial evidence "must be examined" "[w]ithin the framework of the regulations," and that the court "need[ed] to analyze the language of the contracts [between the carriers and The Bee] with a view to both the common law, and the common law as specifically applied by the [EDD] to the newspaper industry."

Examining the contract, the court explained:

20.

"Looking to [T]he Bee's right to control the manner and means of accomplishing the contracted for result, the evidence adduced at trial demonstrated that although [T]he Bee contracted for and 'controlled' the outcome, i.e., timely delivery of a dry, readable paper delivered to the location requested by the subscriber, the means of accomplishing that outcome was not subjected to any particular control. The Bee did not care how the paper got delivered, only that it did and that the delivery was timely and the paper readable. Similarly, although [T]he Bee required that certain advertisements be placed where the clients demanded, the 'check' [T]he Bee performed was only to ensure that what [T]he Bee's clients paid for the contractors provided. The contracted task was timely delivery of a dry readable paper. The way it was accomplished was of no moment. The fact that [T]he Bee checked to ensure that the subscriber received what it was paying for does not convert an independent contractor into an employee."

The court then noted:

"The contracts all focus on the carriers providing a result to the customer, namely, a readable newspaper which is delivered in a manner that protects the papers after delivery. The specific contract provisions that are indicative of independence and are contained within the contract are provisions (1) allowing negotiation of compensation (22 CCR [§] 4304-6(c)(1)); (2) the Hold Harmless provision (*I[bi]d.*); (3) The posting of a bond at the carrier's expense (*I[bi]d.*); (4) negotiation for rates of pay for routes (22 CCR [§] 4304-6(c)(4)); (5) charging customer complaints to the carrier with [T]he Bee handling [c]omplaints (4304-6(c)(5)); (6) the carrier obtaining his or her own substitute without the principal's approval (4304-6(c)(7)); (7) If the principal did have to hire a substitute on behalf of the carrier, [T]he Bee charged the carrier (4304-6(c)(7)); (8) Carrier compensation was either flat fee or per copy (4304-6(c)(2)).

"Further, several provisions of the contract may not be used as evidence of employment pursuant to [section] 4304-6: The fact that [T]he Bee provided an opportunity to participate in an insurance program (4304-6(c)(3)); The requirement of timely delivery of the paper in a readable condition (4304-6(c)(4)); The Bee's right to terminate if there was a material breach (4304-6(c)(6)); The Bee's right to terminate a carrier with 35 days' Notice (4304-6(c)(6)); The Bee limiting the carriers' use of the subscriber list (4304-6(c)(1)); The Bee not allowing the carriers to attach any unauthorized material (4304-6(c)(1)); The Bee's provision of incentive bonuses to carriers for new subscriptions (4304-6(c)(2)); The requirement that the carriers maintain a current subscriber list that must be given to the principal upon request (4304-6(c)(4)).

21.

"At trial the [carriers] emphasized [T]he Bee's requirement that the carriers deliver a dry, readable paper as evidence of 'control.' As set forth above, this is not to be used as evidence of control so long as 'other factors indicate the absence of control by the principal of the **manner and means** of delivery.' 4304-6(c)(4) (emphasis added). Contract provisions relating to results are irrelevant to the right to control the manner and means of performance. [The carriers] also stressed the fact that the carriers were charged for customer complaints and [T]he Bee as opposed to the carriers often responded to those complaints and remedied the issue. The Regulations specifically state that this is evidence of independence; not employment. 4304-6(c)(5)." (Fns. omitted.)

### ii.     The EDD Regulations

Section 4304-6 is one of several regulations promulgated by the EDD for purposes of determining whether a worker is an employee for purposes of the Unemployment Insurance Code. (See generally, Cal. Code Regs., § 4304-1 et seq.) Section 4304-1 of the California Code of Regulations (section 4304-1) states:

"Whether an individual is an employee for the purposes of Sections 621(b) and 13020 of the [Unemployment Insurance C]ode will be determined by the usual common law rules applicable in determining an employer-employee relationship. Under those rules, to determine whether one performs services for another as an employee, the most important factor is the right of the principal to control the manner and means of accomplishing a desired result. If the principal has the right to control the manner and means of accomplishing the desired result, whether or not that right is exercised, an employer-employee relationship exists. Strong evidence of that right to control is the principal's right to discharge at will, without cause."

Section 4304-1 goes on to identify 10 factors that are to be considered "indicia of the right to control." (Cal. Code Regs., § 4304-1, subd. (b); see *ibid*., subd. (a).) "In both purpose and effect, the regulation restates the *Borello* factors."[11] (*Vendor Surveillance*, *supra*, 62 Cal.App.5th at p. 71.)

---

[11]     Notably, however, most of the text of section 4304-1 predates our Supreme Court's 1989 decision in *Borello*. (See Cal. Code Regs., § 4304-1, Register 84, No. 8 (Feb. 23, 1984); Register 86, No. 37 (Sept. 9, 1986).)

Section 4304-6 provides that the "determination of whether a carrier is an employee or an independent contractor in the newspaper distribution industry will be determined generally by the rules set forth in [section] 4304-1," but "specific application of those rules to services in the newspaper distribution industry are set forth in [section] 4304-6." (Cal. Code Regs., § 4304-6, subd. (a).) Section 4304-6 goes on to provide " 'Basic Guidelines'. . . to be considered in determining the employment/independent contractor status of newspaper carriers, some of which evidence employment status and some of which evidence independent contractor status." (*Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 351 (*Espejo*).) The detailed "Guidelines," which were relied on extensively by the trial court, provide:

> "(1) Written agreements. A written agreement signed by both parties shall be evidence of intent. However, if the terms of the agreement are not complied with in practice, the agreement shall not determine the intent or the relationship of the parties. A written agreement to the extent it provides for negotiation of terms, including fees, expense adjustments and other items of compensation to the carrier, shall tend to indicate the existence of an independent contractor relationship. The outcome of any such negotiations shall not be evidence of the existence of either an employment or an independent contractor relationship.

> "A provision prohibiting the carrier from affixing to, or inserting in, the newspaper any materials unauthorized by the principal or from making use of the principal's subscriber list without the principal's consent shall not be evidence of employment or independence.

> "A provision by which the carrier holds the principal harmless from liability shall be evidence of independence.

> "A provision whereby the carrier agrees to post a bond with the principal at the carrier's expense shall be evidence of independence unless the principal increases the carrier's remuneration to pay the cost of such bond.

> "(2) Compensation. Compensation to the carrier in the form of an hourly rate shall be evidence of an employment relationship. Compensation to the carrier in the form of a flat fee per route or per copy delivered shall be evidence of an independent contractor relationship.

23.

"Other bases for compensation, combining factors of distance, difficulty and expense of delivery, shall be evidence of an employment relationship to the extent that such terms are nonnegotiable and of an independent contractor relationship to the extent that they are negotiable.

"Bonuses which are paid as an incentive to the maintenance or improvement of customer satisfaction on the carrier's route, such as might be indicated by a slowed rate of cancellations or an increased rate of starts, shall not be evidence of employment or independence.

"(3) Benefits plans. The fact that a principal provides the opportunity for a carrier to participate in a health, medical, life insurance, or retirement insurance program shall not be evidence of an employment relationship if the carrier is charged for premiums necessary for participation in such program. Any adjustment in remuneration of the carrier to compensate him or her for the payment for participation in such benefits plans shall be evidence of employment.

"(4) Conditions of service. The fact that a principal and carrier agree that the carrier shall deliver a newspaper to each customer on his or her route in a timely manner and in a readable condition shall not be evidence of an employment relationship as long as other factors indicate the absence of control by the principal of the manner and means of such delivery.

"Timeliness of delivery may be indicated by agreement for delivery or completion of a route by a certain hour.

"Readability may be indicated by agreement for protecting the newspaper against damp conditions or by placement on the customer's premises, as the situation may require, in a location readily accessible to the customer and protected from theft, animals or moisture.

"The fact that carriers are assigned routes by the principal and that such assignments are not negotiated with regard to remuneration shall be evidence of employment. However, if a route is offered to a carrier and the remuneration for servicing the route is negotiable, it shall be evidence of independence.

"The fact that the carrier is required to maintain a subscriber list and update such list and provide copies to the principal upon request for the benefit of the principal shall not be evidence of either an employee or independent contractor relationship.

"Where the principal requires the carrier to deliver billings without agreement on compensation to the subscribers, such requirement shall be evidence of employment; however, where the carrier is given the option of delivering billings for additional remuneration, such evidence shall tend to indicate independence. The fact that the principal bills the subscribers and is responsible for collecting the accounts receivable shall not be evidence of employment or independence.

"The fact that the principal provides transportation for the carrier's delivery of the newspaper, at less than a fair market cost to the carrier, shall be evidence of employment.

"(5) Customer complaints. Customer complaints as to missed delivery, late delivery or delivery in an unreadable condition may be taken by the principal and referred to the carrier without giving rise to the inference of either an employment or an independent contractor relationship. The fact that the principal requires the carrier to respond to or correct such problems shall tend to indicate an employment relationship. The fact that the principal responds to or corrects such problems directly and charges the carrier with a penalty or with the principal's cost of corrective action shall tend to indicate the existence of an independent contractor relationship; the absence of such a charge will be evidence of employment. The fact that the principal gives the carrier the option of either personally correcting the problem or being charged with a penalty or with the principal's cost of correction shall tend to indicate an independent contractor relationship.

"(6) Termination. When, by terms of an agreement or by practice of the principal, the relationship between the principal and carrier may be unilaterally terminated without 30 days' notice, it will be evidence of employment. A right of termination without such notice for breach of statutory or regulatory requirements, for the protection of the public or for a material breach by the carrier of the terms and conditions of service including, but not limited to, abandonment or complete failure to deliver a route, or late, incomplete or damaged delivery over a period of time, or other significant interference with customer relationships, shall not be evidence of employment.

"(7) Substitutes. The fact that the principal provides substitute carriers for the regular carriers shall be evidence of employment. However, if the principal provides a substitute in an emergency situation and charges the carrier for such delivery, it is evidence of independence. The fact that the carrier can obtain his or her own substitute without the principal's approval shall be evidence of independence. If a substitute carrier is paid

directly by the principal in non-emergency situations, whether the substitute is chosen by the carrier or principal, it shall be evidence of employment.

"(8) Recruitment advertising and applications. Terminology in carrier recruitment advertising and carrier application forms will be evidence of independence or employment.

"(9) Workers' Compensation Insurance. The fact that a principal carries workers' compensation insurance on all carriers, whether in an employment or independent contractor relationship, shall not create an inference of employment or independence." (Cal. Code Regs, § 4304-6, subd. (c).)

### iii. General Principles of Agency Deference

There are "two classes of [administrative] rules—quasi-legislative and interpretive." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10 (*Yamaha*).) Quasi-legislative rules are a form of substantive lawmaking by an agency, within the agency's jurisdiction, on a subject for which the Legislature has delegated lawmaking power to the agency. (*Ibid.*) Review of quasi-legislative rules is narrow: the rule must only "lay within the lawmaking authority delegated by the Legislature," and be "reasonably necessary to implement the purpose of the statute." (*Id.* at pp. 10-11.) In contrast, interpretive rules represent "the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts." (*Id.* at p. 11.) Courts give limited deference to an agency's determination of a statute's meaning and effect. (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 236; accord, *Yamaha*, at pp. 8, 11.) Thus, " '[t]he standard for judicial review of agency interpretation of law is the *independent judgment* of the court, giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.' " (*Yamaha*, at p. 8.)

Not all administrative rules can be neatly categorized as either quasi-legislative or interpretive. (*Yamaha*, *supra*, 19 Cal.4th at p. 6, fn. 3; accord, *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 799.) Rather, the two classes constitute "opposite ends of an

26.

administrative continuum, depending on the breadth of the authority delegated by the Legislature." (*Yamaha*, at p. 6, fn. 3.) "Regulations that fall somewhere in the continuum may have both quasi-legislative and interpretive characteristics, as when an administrative agency exercises a legislatively delegated power to interpret key statutory terms." (*Ramirez*, at p. 799.) For example, although the Legislature delegated to the IWC the power to elaborate on the meaning of key statutory terms, our Supreme Court has held that a wage order construing a portion of the Labor Code within the IWC's authority "has both quasi-legislative and interpretive characteristics." (*Id.* at pp. 799-800.) We analyze such hybrid regulations under the standards of review applicable to both. (*New Cingular Wireless PCS, LLC v. Public Utilities Com.* (2016) 246 Cal.App.4th 784, 811; accord, *Ramirez*, at pp. 800-801.)

### iv. Analysis

We begin our analysis by reiterating the nature of the carriers' claim. The carriers' sole remaining claim at trial alleged that the newspaper engaged in unfair competition within the meaning of Business and Professions Code section 17200, based on the allegation that the newspaper violated Labor Code section 2802 by failing to pay the carriers' necessary mileage expenses. The DLSE is the state agency empowered to enforce and interpret the Labor Code. (See *Brinker*, *supra*, 53 Cal.4th at p. 1029, fn. 11; see also Lab. Code, §§ 79, 82.)

In contrast, the EDD is the state agency vested with jurisdiction over the state's unemployment insurance program. (Unemp. Ins. Code, § 301; *American Federation of Labor v. Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017, 1024; *Rebolledo v. Tilly's Inc.* (2014) 228 Cal.App.4th 900, 919.) Under this authority, the EDD promulgated sections 4304-1 and 4304-6, to determine whether a worker qualifies as an employee for purposes of the Unemployment Insurance Code. (See §§ 4304-1, 4304-6.) Indeed, the regulation is expressly limited to determinations relating to unemployment compensation. (See § 4304-1; Unemp. Ins. Code, §§ 621, 13020.)

27.

In promulgating section 4304-6, the EDD did not purport to engage in rulemaking regarding a worker's right to indemnification for necessary expenditures under Labor Code section 2802, nor would such a rule be within the EDD's jurisdiction. We are aware of no authority that suggests a regulation is entitled to deference on a question outside the promulgating agency's jurisdiction. Whatever relevance section 4304-6 may have in the context of unemployment compensation,[12] the regulation is instructive at best in relation to the Labor Code. We decline to defer to the language of section 4304-6 beyond the narrow purpose for which it was drafted.[13]

Nor do we find section 4304-6 particularly instructive. Contrary to the newspaper's assertion, section 4304-6 does not represent a straightforward application of *Borello*, but rather diverges from the common law test in material ways. For example, the regulation provides that termination without cause and without 30 days' notice is evidence of employment (Cal. Code Regs., § 4304-6, subd. (c)(6)), while case law applying *Borello* has regularly found that termination without cause supports a finding of employment, regardless of whether 30 days' notice is required. (See, e.g., *Poizner*,

---

[12]    The validity of section 4304-6 as applied to the Unemployment Insurance Code is not before us. We note, however, that section 4304-6 identifies itself an interpretive aid for determining whether a worker qualifies as an employee for purposes of sections 621 and 13020 of the Unemployment Insurance Code. (See §§ 4304-1, 4304-6.) In 2019, section 621 of the Unemployment Insurance Code was amended to define "employee" under the ABC test. (See Unemp. Ins. Code, § 621, subd. (b); Stats. 2019, ch. 296, § 5.) It therefore appears that sections 4304-1 and 4304-6 have been abrogated by statute. Relatedly, we note that proposed amendments to these regulations have been placed on the EDD's 2020 and 2021 rulemaking calendars. (<https://www.edd.ca.gov/about_edd/pdf/2020_Rulemaking_Calendar.pdf> [as of Sept. 30, 2021]; <https://www.edd.ca.gov/about_edd/pdf/Rulemaking_Calendar.pdf> [as of Sept. 30, 2021].)

[13]    Because section 4304-1 effectively reiterates the *Borello* test (see Cal. Code Regs., § 4304-1, subd. (a); *Vendor Surveillance*, *supra*, 62 Cal.App.5th at pp. 70-71), we see no reason to rely on, let alone defer to, this regulation in lieu of the substantial body of case law applying *Borello*. Application of section 4304-1 would not add to or alter our analysis.

*supra*, 162 Cal.App.4th at p. 854 [finding right to discharge at will, without cause, where 30 days' notice was required]; see also *Espejo*, *supra*, 13 Cal.App.5th at pp. 346, 348 [finding that newspaper carriers were employees where contract was terminable on 30 days' notice].) Additionally, the regulation provides that hourly pay shall evidence an employment relationship, whereas flat fee or per copy compensation shall evidence an independent contractor relationship. (Cal. Code Regs., § 4304-6, subd. (c)(2).) Meanwhile, case law applying *Borello* has recognized that piece rate compensation – such as per copy compensation – may be consistent with an employment relationship. (See, e.g., *Espejo*, at pp. 338-339, 351-352; *Poizner*, at pp. 855-856; accord, *Bluford v. Safeway Stores, Inc.* (2013) 216 Cal.App.4th 864, 871; *Gonzalez v. Downtown LA Motors, LP* (2013) 215 Cal.App.4th 36, 40.) Perhaps most significantly, the regulation provides that the newspaper may require a carrier to deliver a newspaper to customers by a particular time and in a readable condition without giving rise to an employment relationship, so long as the newspaper does not otherwise control the "manner and means" of delivery. (Cal. Code Regs., § 4304-6, subd. (c)(4).) However, as we discuss in greater detail below in our analysis of the instant contract, this aspect of the regulation ignores *Borello*'s mandate that a reviewing court consider whether the hiring entity exercised "all *necessary* control" over the delegated operations. (*Borello*, *supra*, 48 Cal.3d at p. 357.) Finally, by emphasizing matters not implicated by the common law test, the regulations have the effect of minimizing the weight given to the factors identified at common law. Indeed, section 4304-6 itself specifies that the common law factors discussed in section 4304-1 are to be applied only where "a specific application is not interpreted by [section] 4304-6." (Cal. Code Regs., § 4304-6, subd. (a).)

We see numerous reasons to reject the newspaper's attempt to import this standard into the common law test for determining employment under the Labor Code. First, we note that section 4304-6 predated *Borello* by two years. (Cal. Code Regs., § 4304-6, Register 87, No. 38 (Sept. 17, 1987).) Thus, to the extent section 4304-6 purported to set

29.

forth the common law test for employment, it necessarily referred to the pre-*Borello* test. (See *Dynamex*, *supra*, 4 Cal.5th at p. 930 [explaining that the *Borello* test is not limited by earlier common law principles and requires consideration of the purposes of the statute at issue].) To the extent section 4304-6 conflicts with *Borello*, it would appear to have been abrogated by that decision.

Second, at least one other court has rejected such an extension of section 4304-6. In *Espejo*, the Court of Appeal held that a trial court is not *required* to apply section 4304-6 in a claim brought under the UCL for violation of Labor Code section 2802. (*Espejo*, *supra*, 13 Cal.App.5th at pp. 340-341, 351-352.) The court opined that the factors set forth in section 4304-6 are merely guidelines, rather than an absolute test, and thus the trial court was free to ignore those guidelines and rely solely on the common law factors set forth in *Borello* and repeated in section 4304-1. (*Espejo*, at pp. 351-352.) Although *Espejo* did not expressly reject application of section 4304-6, we note that many of the contract provisions at issue in that case would not have been considered evidence of employee status under section 4304-6. Nonetheless, the *Espejo* court affirmed the trial court's determination that these factors supported a finding that the carriers were employees, rather than independent contractors. (*Espejo*, at pp. 346-348 [contract specified the workers were independent contractors (contra Cal. Code Regs., § 4304-6, subd. (c)(1)), prohibited workers from inserting materials with the newspaper (contra *ibid*.), required delivery by a specified deadline (contra *id*., subd. (c)(4)), permitted carriers to be charged with a penalty for excessive complaints (contra *id*., subd. (c)(5)), required carriers to post a bond (contra *id*., subd. (c)(1)), and specified that customers would be invoiced by the newspaper (contra *id*., subd. (c)(4))].)

Relatedly, we note the existence of a fairly well-developed body of case law addressing the question of whether newspaper carriers are employees or independent contractors. Not a single published decision has relied on section 4304-6 to resolve this question. (See *Espejo*, *supra*, 13 Cal.App.5th at pp. 351-352; *Poizner*, *supra*, 162

30.

Cal.App.4th at pp. 852-853; *Gonzalez v. Workers' Comp. Appeals Bd.* (1996) 46 Cal.App.4th 1584, 1589-1590; see also, *Ayala*, *supra*, 59 Cal.4th at pp. 530-532; *Sotelo v. Medianews Group, Inc.* (2012) 207 Cal.App.4th 639, 656-657, disapproved on another ground in *Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 986, fn. 15.) Indeed, *Espejo* appears to be the only published decision to reference California Code of Regulations section 4304-6 in the regulation's nearly 34-year history.

Finally, we note that our Legislature has expressed the view that section 4304-6 is incompatible with the *Borello* test. While considering the 2019 legislation that ultimately excluded newspaper carriers from the ABC test, the Senate Rules Committee, Office of Senate Floor Analyses explained:

> "Newspaper distributors and newspaper[] carriers have a uniquely complex regulatory and legal history when it comes to independent contractor law. The core of this complexity comes from an Employment Development Department (EDD) regulation: 22 CCR §4304-6. Created in 1987 under the Deukmajian administration, this regulation is designed to specifically address the question of when a newspaper carrier or newspaper distributor is an employee *for the purposes of Unemployment Insurance Code*. [¶] . . . [¶]

> "In all contexts, however, 22 CCR §4304-6 shows its age: coming 2 years before the *Borello* test and related decisions, the regulation does not reflect the 1989 decision and its focus on factors of control in determining an employer-employee relationship. Despite this, in recent litigation, some newspaper publishers have used the EDD regulation to defend against *wage and hour litigation* – something that the regulation cannot be extended to without ignoring both case law and the permissible scope of EDD regulations. [¶] . . . [¶]

> "A[ssembly ]B[ill No.] 170 addresses these problems by definitely placing newspaper distributors and newspaper carriers under the *Borello* decision for both the purposes of unemployment insurance and wage and hour requirements, effectively nullifying 22 CCR §4304-6, which was already dubious law. By placing newspaper distributors and carriers under the *Borello* test until January 1, 2021, A[ssembly ]B[ill No.] 170 gives the newspaper industry a year to remedy their contracts with newspaper carriers and newspaper distributors in order to come into compliance with

31.

the 2018 California Supreme Court decision in *Dynamex* and the recently-passed Assembly Bill [No.] 5 (Gonzalez), which codifies the *Dynamex* decision." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 170 (2019-2020 Reg. Sess.) as amended Sept. 10, 2019, pp. 2-4.)

We acknowledge these statements were made in relation to the passage of legislation that does not directly bear on the carriers' claim. Nonetheless, in determining which factors are relevant to whether a worker is an employee for purposes of Labor Code section 2802, "[o]ur fundamental task is to ascertain the Legislature's intent and effectuate the law's purpose." (*Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 168.) Our Supreme Court has determined the *Borello* test is the standard for determining whether employment status effectuates the Legislature's intent in the context of a particular statute. (*Dynamex*, *supra*, 4 Cal.5th at p. 934.) Our Legislature has given no indication it intended to circumscribe that standard, for purposes of the Labor Code, with the factors set forth in section 4304-6. We find it relevant that the Legislature has since expressly disapproved of attempts to do so.

Based on the foregoing, we conclude the trial court erred in deferring to section 4304-6 to determine the carriers were independent contractors.

## III. The Trial Court Failed to Properly Analyze the *Borello* Factors

After finding the carriers were independent contractors under section 4304-6, the trial court also purported to find, in the alternative, that the carriers were independent contractors under the common law test. As we explain, however, the trial court failed to fully set aside the EDD regulations in attempting to apply *Borello*. Because the trial court failed to properly analyze the factors required by *Borello*, we must reverse. (See *Linton v. DeSoto Cab Co., Inc.* (2017) 15 Cal.App.5th 1208, 1225 (*Linton*).)

### A. Standard of Review

We review questions of law under a de novo standard of review. (See *Ruiz v. Musclewood Property Investments, LLC* (2018) 28 Cal.App.5th 15, 20.) We will reverse

32.

if the court misapplied the law and the error was prejudicial. (See *Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 313-314.)

When the trial court applies the proper legal standard, "[t]he determination of employee or independent-contractor status is one of fact if dependent upon the resolution of disputed evidence or inferences." (*Borello*, *supra*, 48 Cal.3d at p. 349.) The decision will be upheld if the court's factual findings are supported by substantial evidence. (*Ibid.*) "If the evidence is undisputed, the question becomes one of law." (*Ibid.*)

## B.    Right to Control

As explained in detail above, the trial court's analysis of the newspaper's right of control was based primarily on the guidelines set forth in section 4304-6. In the sole paragraph of the court's analysis that did not cite to section 4304-6, the court found that the newspaper contracted for a specific outcome (timely delivery of a newspaper in dry, readable condition), but exercised no particular control over how that outcome was accomplished, and merely checked to see that its clients and subscribers received the services they paid for. However, this is simply a restatement of section 4304-6, which provides that a requirement for delivery of a newspaper in "a timely manner and in a readable condition shall not be evidence of an employment relationship as long as other factors indicate the absence of control by the principal of the manner and means of such delivery." (See Cal. Code Regs., § 4304-6, subd. (c)(4).) Indeed, the trial court relied on California Code of Regulations section 4304-6, subdivision (c)(4) to make this same finding later in its statement of decision.

This is not an adequate application of the common law test. Contrary to section 4304-6, *Borello* held there is often "little use" in determining whether the principal has the right to control the manner and means of accomplishing the result desired. (*Borello*, *supra*, 48 Cal.3d at p. 350; accord, *Dynamex*, *supra*, 4 Cal.5th at p. 958 ["a business need not control the precise manner or details of the work in order to be found to have maintained the necessary control that an employer ordinarily possesses over its

employees"].) Thus, while the trial court relied on factors such as the carriers' freedom to choose between throwing a newspaper from their car or hand delivering it to the subscriber's porch to conclude the carriers were generally free of the newspaper's direction, *Borello* required the court to consider whether the newspaper retained " 'all *necessary* control' " over the delegated operations. (*Ayala*, *supra*, 59 Cal.4th at p. 531; accord, *Dynamex*, at p. 958; *Borello*, at p. 357.) The hiring entity's right to control the necessary operations is the " 'most important' or 'most significant' consideration" under *Borello*. (*Borello*, at pp. 350, 357; accord, *Ayala*, at p. 531.) Yet, the trial court did not purport to consider this factor.[14] Because the trial court failed to consider necessary elements of the *Borello* test, and instead relied on the EDD standard, we must reverse. (See *Linton*, *supra*, 15 Cal.App.5th at p. 1225.)

Having so concluded, the carriers ask us to hold that they are employees as a matter of law. However, the question of whether the carriers were employees or independent contractors is one of law only if the evidence is undisputed. (*Borello*, *supra*, 48 Cal.3d at p. 349.) We acknowledge that many of the facts found by the trial court are suggestive of employee status. As in *Borello*, it appears that newspaper delivery "involves simple manual labor which can be performed in only one correct way," rendering "detailed supervision and discipline unnecessary." (*Id*. at pp. 356-357.) Thus,

---

**14** The trial court also failed to consider "the intended scope and purposes" (*Dynamex*, *supra*, 4 Cal.5th at p. 934) of Labor Code section 2802 in order to determine whether employee or independent contractor classification "best effectuates the [statute's] underlying legislative intent and objective," a necessary consideration under *Borello*. (*Dynamex*, at p. 934.)

Labor Code section 2802 "shows a legislative intent that duty related losses ultimately fall on the business enterprise, not on the individual employee." (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 74, fn. 24.) "[T]he obvious purpose of [Labor Code section 2802] is to protect employees from suffering expenses in direct consequence of doing their jobs." (*Grissom v. Vons Companies, Inc*. (1991) 1 Cal.App.4th 52, 60; see *Janken*, at p. 74, fn. 24; accord, *Cochran v. Schwan's Home Service, Inc.* (2014) 228 Cal.App.4th 1137, 1144.)

unsurprisingly, courts have determined that newspaper carriers operating under contracts similar to those presented here were subject to pervasive control by the contracting newspaper. (See *Espejo*, *supra*, 13 Cal.App.5th at pp. 343-346; *Poizner*, *supra*, 162 Cal.App.4th at pp. 853-854;[15] *Gonzalez v. Workers' Comp. Appeals Bd.*, *supra*, 46 Cal.App.4th 1584, 1589-1593.)

Nonetheless, the carriers and the newspaper each point us to evidence they contend is indicative of either the newspaper's right to control or a lack thereof. Much of this evidence is disputed. For the most part, the trial court did not resolve whether the evidence was credible or whether the evidence described policies applicable to the entire class. We therefore cannot find the carriers are employees as a matter of law, and instead remand for the trial court to address, in the first instance, the newspaper's right to control the necessary operations in light of the principles set forth in this opinion.

## C.     Secondary Factors

The court considered 14 secondary factors derived from *Borello*. (See *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1064, fn. 14 ["These factors substantially include: (1) whether there is a right to fire at will without cause; (2) whether the one performing services is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the

---

[15]     The trial court declined to consider *Poizner* because it was a workers' compensation case and involved deferential review of an agency decision. Although differently postured, the facts nonetheless may support a finding of employee status for different types of social welfare legislation. (See *Dynamex*, *supra*, 4 Cal.5th at pp. 914-915, 919 [approving extension of *Borello* analysis beyond the workers' compensation context; accord, *Espejo*, *supra*, 13 Cal.App.5th at p. 348 [relying on *Poizner* in a case involving Labor Code violations].)

person doing the work; (6) the length of time for which the services are to be performed; (7) the method of payment, whether by the time or by the job; (8) whether or not the work is a part of the regular business of the principal; (9) whether or not the parties believe they are creating an employer-employee relationship; (10) whether the classification of independent contractor is bona fide and not a subterfuge to avoid employee status; (11) the hiree's degree of investment other than personal service in his or her own business and whether the hiree holds himself or herself out to be in business with an independent business license; (12) whether the hiree has employees; (13) the hiree's opportunity for profit or loss depending on his or her managerial skill; and (14) whether the service rendered is an integral part of the alleged employer's business."].)

Here, too, the trial court seemingly relied on the EDD regulations to resolve at least some of the secondary factors. For example, the court concluded that the contract did not create an at-will employment relationship because it was terminable only for material breach or upon 35 days' notice. (See Cal. Code Regs., § 4304-6, subd. (c)(6); contra, *Poizner*, *supra*, 162 Cal.App.4th at p. 854; *Espejo*, *supra*, 13 Cal.App.5th at p. 346.) The court also considered the carriers' lack of an hourly wage as evidence of independence. (See Cal. Code Regs., § 4304-6, subd. (c)(2); contra, *Borello*, *supra*, 48 Cal.3d at pp. 357-358; *Poizner*, at pp. 855-856.) And, the court seemingly considered the carriers' ability to use substitutes of their own choosing as evidence of independence. (See Cal. Code Regs., § 4304-6, subd. (c)(7); contra, *Poizner*, at p. 856.) On remand, the trial court is directed to consider the secondary factors without resort to section 4304-6, and with an eye toward determining whether employee or independent contractor status best effectuates the intended scope and purposes of Labor Code section 2802. (*Dynamex*, *supra*, 4 Cal.5th at p. 934.)

## IV. The Carriers' Remaining Arguments

### A. The Trial Court Misapplied the Burden of Proof

The trial court held the carriers "at all times" bore the burden of proof. We agree with the carriers that the trial court erred; the newspaper bore the burden of proving the carriers were independent contractors.

Allocation of the burden of proof presents a question of law, which we review de novo. (See *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1157.)

Evidence Code section 500 provides, "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." Under Evidence Code section 500, the plaintiff generally bears the burden of establishing the elements of his or her cause of action. (*Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1668.) However, the burden of proof may be reallocated by statute or common law. (See *id.* at p. 1670.)

In *Borello*, our Supreme Court explained that "[o]ne seeking to avoid liability has the burden of proving that persons whose services he has retained are independent contractors rather than employees." (*Borello*, *supra*, 48 Cal.3d at p. 349.) In so holding, the high court relied on Labor Code section 3357, which contains a statutory presumption that a person rendering service for another is an employee, and Labor Code section 5705, which provides that independent contractor status is an affirmative defense to a claim that a person was injured while performing service for an alleged employer. (Lab. Code, § 5705, subd. (a).) Both provisions are contained in division 4 of the Labor Code, which pertains to Workers' Compensation and Insurance.

Here, the carriers did not proceed to trial on a workers' compensation claim. Thus, the presumptions set out in Labor Code sections 3357 and 5705 do not directly apply. Nonetheless, courts have routinely extended these presumptions to other contexts. (See, e.g., *Robinson v. George* (1940) 16 Cal.2d 238, 242 [holding in the personal injury

37.

context, that "the fact that one is performing work and labor for another is prima facie evidence of employment and such person is presumed to be a servant in the absence of evidence to the contrary" (italics omitted)]; *Linton*, *supra*, 15 Cal.App.5th at p. 1221 [holding that "the rebuttable presumption of employment in [Labor Code,] section 3357 applies to actions brought under Labor Code provisions falling outside workers' compensation"]; accord, *Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 76, 82-84 [burden was on employer to establish independent contractor status on claims for failure to pay overtime compensation, failure to provide itemized wage statements, failure to indemnify business expenses, and unfair and unlawful business practices].) Our Supreme Court recently cited to this line of authority with approval, stating: "[T]he rule that a hiring entity has the burden of establishing that a worker is an independent contractor rather than an employee has long been applied in California decisions outside the workers' compensation context." (*Dynamex*, *supra*, 4 Cal.5th at p. 957, fn. 24; see *id.* at pp. 914-915.)

The newspaper nonetheless suggests that the carriers bear the burden of proof pursuant to Evidence Code 500 because their claim is not brought under the Labor Code, but rather the UCL. However, where, as here a UCL claim is derivative of an underlying violation of law, it must stand or fall with the underlying claim. (See *Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 896-897.) Accordingly, the burden to prove an unlawful act or practice rests with the party who bears the burden on the underlying claim. (*Parada v. East Coast Transport Inc.* (2021) 62 Cal.App.5th 692, 695, 698-699 [placing burden on employer to prove worker was an independent contractor on a UCL claim based on an alleged wage order violation]; *Maldonado v. Epsilon Plastics, Inc.* (2018) 22 Cal.App.5th 1308, 1320, 1327 [placing burden on employer to prove worker was an independent contractor on a UCL claim based on alleged violation of Lab. Code, § 510 for failure to pay overtime].) It was the newspaper's burden to establish the

carriers were independent contractors for purposes of Labor Code section 2802.  The same is true on the carriers' derivative UCL claim.

The newspaper also suggests the carriers stipulated that they bore the burden of proof.  This argument strains credulity.  The "stipulation" cited by the newspaper is one of several "stipulations and further recitals" agreed to by the parties.  (Boldface, capitalization & underlining omitted.)  The purported stipulation memorializes certain rulings of the trial court for conduct of the bifurcated trial.  Additionally, the purported stipulation indicates these rulings were derived from the newspaper's "Case Management Conference Statement."[16]  The paragraph at issue states, among other things, "Because [the carriers] have the burden of proof on those issues, they will proceed first."  However, the record does not suggest this is anything other than an agreement that the court so ruled.  The newspaper directs us to no point in the record in which the carriers agreed they bore the burden to prove employee status.  To the contrary, the carriers asserted in the trial court that they bore only an initial burden to demonstrate the carriers were performing work for the newspaper, whereas the newspaper bore the ultimate burden to prove the carriers were independent contractors.

Accordingly, we conclude the newspaper bore the burden of proving the carriers were independent contractors.  The trial court misallocated the burden of proof.

**B.      Equitable Considerations do not Bear on Liability**

The carriers argue the trial court erred in relying on equitable considerations to determine the newspaper's liability.  To the extent the trial court did so, we agree it was error.

In considering whether the language of the contracts concerning independent contractor status was merely subterfuge, the trial court stated as follows:

---

**16**     The Case Management Conference Statement itself is not contained in the record before us.

39.

"This is an action in equity. The [newspaper] complied with and relied upon California's EDD regulations regarding which factors are not to be taken as evidence of employment in the context of newspaper carriers. In fact, Tom Cullinan[17] testified that in 2000 the [S]tate of California conducted an analysis of the [newspaper's] relationship with its carriers and concluded that the carriers were properly classified as independent contractors. [Citation.] Although intent is not an element in an unfair business practices case, the understanding of the parties is relevant to an analysis of employment versus independence. *It would be unfair for the [newspaper] to be penalized for relying upon the Regulations and following them.* Given their close adherence to the EDD Regulations, the [newspaper] believed that the carriers who contracted with it were independent contractors. This belief was validated by the EDD's audit of [the newspaper] in 2000. [The carriers] submitted nothing to refute the [newspaper's] bona fide belief in the independent contractor status of the carriers. The contracts were not a mere subterfuge. As set forth above, the court considered both the common law test and the EDD Regulations and finds that application of both support a conclusion that the carriers were properly classified as independent contractors."[18] (Italics added.)

Our Supreme Court has explained the proper role for equitable considerations in a Business and Professions Code section 17200 proceeding. "The UCL imposes strict liability when property or monetary losses are occasioned by conduct that constitutes an unfair business practice." (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 181 (*Cortez*).) Thus, equitable considerations generally cannot defeat a defendant's liability: "[E]quitable defenses may not be asserted to wholly defeat a UCL

---

**17** Cullinan is the president and publisher of The Fresno Bee.

**18** The carriers also argue this ruling is not factually supported because Cullinan testified it was the EDD, rather than the state, which audited the newspaper. Additionally, the carriers contend, without citation to the record, that the EDD held the carriers to be employees, and this finding was overturned by an administrative law judge. Prior to trial, the trial court declined to take judicial notice of the administrative law judge's decision.

There may be merit to the carriers' arguments. However, because these arguments are not properly presented, we do not address them. (See Cal. Rules of Court, rule 8.204(a)(1)(B); *Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 201 [failure to comply with rule requiring each argument be presented under a separate heading forfeits the argument].)

claim since such claims arise out of unlawful conduct." (*Id.* at p. 179.) To the extent the trial court determined it would be unfair to hold the newspaper liable for improperly classifying the carriers as independent contractors, the trial court erred.

Equitable defenses such as good faith may be considered in fashioning a remedy under Business and Professions Code section 17200. (*Cortez*, *supra*, 23 Cal.4th at pp. 180-181; *People ex rel. Harris v. Aguayo* (2017) 11 Cal.App.5th 1150, 1173.) However, the court is required to consider the relative equities on both sides of the dispute, and not merely the unfairness to one party. (*Cortez*, at p. 180; see *id.* at p. 182 (conc. opn. of Werdegar, J.) ["[E]quitable considerations normally should not lead a trial court to reduce or eliminate a UCL restorative order when it is established that the defendant committed an unlawful practice, but the defendant claims that its violation was unintentional or committed in a good faith belief the action was lawful. Rather, in general, as between a person who is enriched as the result of his or her violation of the law, and a person intended to be protected by the law who is harmed by its violation, for the violator to retain the benefit would be unjust."].) In any event, here, any weighing of the equities was premature, as the bifurcated trial proceeded only on the issue of liability.

### C. The Trial Court's Reliance on Unrepresentative Testimony

The carriers contend the trial court improperly relied on testimony from unrepresentative absent class members to conclude the carriers were independent contractors.

We are unable to evaluate the merits of this argument. The record in this case is comprised primarily of appellant's appendix, which spans 20 volumes and more than 11,000 pages. The reporter's transcript is comprised of nearly 8,000 pages. Although the carriers direct us to portions of the statement of decision they contend were based on "cherry-picked witness testimony," they do not direct us to the testimony at issue. "It is not the function of this court to comb the record looking for the evidence or absence of evidence to support [a party's] argument." (*People ex rel. Reisig v. Acuna* (2010) 182

41.

Cal.App.4th 866, 879; see *People ex rel. Strathmann v. Acacia Research Corp.* (2012) 210 Cal.App.4th 487, 502-503 [if a party fails to support its argument with necessary citations to the record the argument will be deemed waived].)

Moreover, we note the authority cited by the carriers provides that a party seeking to extrapolate facts regarding classwide liability from the testimony of a small sample of absent class members must develop their sampling strategy with the input of an expert. (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 13, 38-40.) However, in motions in limine regarding the testimony of absent class members, the newspaper disavowed any intent to extrapolate classwide data from the testimony of absent class members, stating, "On the contrary, [the newspaper] will offer class member testimony to show that certain facts do <u>not</u> apply classwide." It was on this representation that such testimony was permitted. The trial court is directed to remain mindful of this limitation on remand.

## DISPOSITION

The judgment is reversed. Costs are awarded to the carriers. (California Rules of Court, rule 8.278(a)(1).)

 

 

DETJEN, J.

WE CONCUR:

 

HILL, P. J.

 

FRANSON, J.

42.